## PERRY vs. O'HANLON.

1. Where by an act of Congress granting pre-emptions to settlers upon public lands a time is limited within which the settler may avail himself of the privileges of the act, and the settler within such time does all that is required to give him a right of pre-emption, the delay of the officers of government by which the pre-emptor is defeated in getting his certificate of pre-emption within the requisite time, will not defeat his right, but the certificate may be granted after the expiration of the time allowed by law.

2. The courts of this State have power to determine titles to land lying in the State, in a contest between citizens of this State, although such contest involve the construction of acts of Congress.

3. In such cases an appeal will lie to the Supreme Court of the United States.

4. In cases in which the act of Congress vests the officers of government with an absolute discretion in determining the rights of parties claiming land, the courts cannot intefere. But where titles have emanated and a contest arises, the courts must determine the validity of the titles and decide upon the legality of the acts of the officers.

5. By the act of July 9th, 1832, claimants whose claims had been rejected could obtain a pre-emption only by being actual settlers and housekeepers. But claimants whose claims had not been rejected could by a relinquishment of their claim before a decision acquire a pre-emption; and the certificate of the recorder of such relinquishment is the evidence of the right to such pre-emption. In the latter case no settlement was necessary.

6. A person having entered land under a preemption act, his entry is afterwards cancelled by the Commissioner of the General Land Office. If in such case it appear that the cancellation thus made was not authorized by law, it will be regarded as a nullity.

7. A patent issued for land reserved from sale is void.

8. By the act of July, 1832, all land to which claims were presented was reserved from sale, until some disposition of such claim could be made. And where claims were presented to land, and the claim relinquished to the U. S. before any decision upon such claim, the reservation still continues, no act of Congress having been taken of such reservation. And a patent to such land is void if granted to any other than the claimant, who takes under the relinquishment.

GARLAND, *for Appellant.*

1. The declaration in this case was filed the 19th February, 1840. On the 9th March following, the defendants filed their pleas, and issue was joined. The pre-emption law under which the defendants made their entry and obtained the patents set up in their defence in this action, was not passed until 1841. The counsel for the appellant contends, that laws and facts which have come into existence since the pleadings in this case have been closed and the issue made up between the parties, cannot be permitted to influence it, nor introduced as evidence. *Ex post facto* laws are odious and unconstitutional—*re-troactive* laws are no less so. 13 Mass. R. 472.

2. If in the judgment of the court the facts have been supplied, which prove that the certificate bearing date 26th Nov. 1839, several years after the expiration of the act of 1832, under which it purports to have been issued, was, notwithstanding the date thereof, *lawfully issued,* they will not look behind the certificate, but regard it as in all similar cases, *prima facie* of title; having been issued by authority of the commissioner, the court presumes it to have been lawfully done.

3. The certificate of the receiver is *prima facie* evidence of an entry having been made—*but is not the entry itself*—the certificate may be defective or void, but the entry is wholly a different thing, and whether there has been an entry or not, in the meaning of the statute, depends on the facts and circumstances of each case as it arises. There can be no general rule, or *procustes-bed* to force them into the same measurement.

4. This is a contract between Perry and the government, based on terms proposed by the latter in the *proviso* of the act of 1832, and accepted by Perry—Perry has fulfilled, or offered to fulfil, all the terms of the contract on his part—the government has failed to comply with her part of the agreement. It is not in the power of one of the contracting parties by his own acts, or the acts of his agent, to destroy the obligation of the contract; much less is it in the power of the government to pass a law taking away from a citizen, rights which had accrued to him under a previous law. Ott vs. Soulard, 9 Mo. R. 760; Fletcher vs. Peck, 2 Cond. U. S. Rep. 308.

5. If the entry made the 1st Sept. 1834, be regarded as not sufficient within the meaning of

the statute, *the deed of relinquishment is still good;* the rights accruing therefrom cannot be avoided by the government—the only claim *they have* to the land is the *conveyance in that deed*—without it Perry would be protected by the acts of 1811 and 1818, reserving from sale all lands for which a claim had been filed in the office of the recorder of land titles. *Claiming under the deed,* the government must comply with the terms on which they have obtained it—that is, they must re-convey to Perry, on the payment of $1 25 per acre—he has a pre-emption right to the land—*the deed is his evidence*—the government can give title to no other person, and this court must protect him in that right. 9 Mo. R. 760.

6. If the deed of relinquishment, and all the proceedings under it, of the entry made in 1834, and the certificate of entry made in 1839, be all void, then Perry is thrown back upon his rights existing before he attempted to procure the land as a pre-emptor, under the proviso of the third section of the act of 1832. He will then stand as the legal representative of Bazil Valle, claiming the land which has been reserved from sale by the acts of 1811 and 1818 to fill that claim.— The board of commissioners under the act of 1832 and the supplement of 1833, took testimony to prove inhabitation, cultivation, &c., and the same was spread on the record December 3rd, 1833. The board took no further action in the case—they neither placed it in the one or other class required by law—there has been no report of it made to Congress, *nor has there been any final action of Congress thereon.* It is still, therefore, a reserved claim. The commissioner of the General Land Office, when he cancelled Perry's certificate in 1843, and sought thereby to nullify all the acts done under the proviso of the 3rd section of the act of 1832, *declared* that the land was still reserved under the acts of 1811 and 1818, to fill Perry's claim, and that the parties setting up a claim could not be permitted to enter. The court below therefore erred in refusing testimony to prove that Perry, as the legal representative of Bazil Valle, had a right to the land reserved to fill Valle's claim.

7. The patent in this case was issued for land never offered at public sale—not subject to private entry, and reserved from sale until the final action of Congress. Moreover, the law of September 1st, 1841, under which the defendants made their entry, declares that "no lands included in any reservation by any treaty, law or proclamation of the President of the United States, shall be liable to entry under or by virtue of the provisions of this act." The patent, therefore, is void. Stoddard's heirs, 3 Howard; Allison vs. Hunter, 9 Mo. R., 765; DeArmas vs. Mayor, et al, 5 La. R., 177.

LEONARD, *for Appellee.*

The only title relied on by Perry is the entry under the pre-emption clause of the act of 9th July, 1832.

To his title, the answer is,—

1st. The entry was cancelled by the Executive Department of the Government on account of its having been made by one who was not an actual settler and housekeeper on the land enclosed; and being cancelled, is void from the beginning and never conferred any right upon the plaintiff to recover the land. Act of May 18, 1796, Land Laws, 50; Amendatory act thereto of May 10, 1800, Land Laws, 70; Act 2nd March, 1805, Land Laws, 127; Act 25th April, 1812, Land Laws, 211; Act 17th February, 1818, Land Laws, 293; Act 9th July, 1832, and of 2nd March, 1833, Land Laws, 505 and 519; Act 4th July, 1836, Land Laws, 552.

2nd. The patents given in evidence constitute such a title in one of the defendants to part, and in a third person to the residue of the land, as is superior at law to the title of the plaintiff, even if the entry be considered a lawful and subsisting entry.

NAPTON, J., *delivered the opinion of the Court.*

This was an action of ejectment brought by Perry to recover a tract of land in Washington county. The suit was first tried in 1841, when Perry obtained a judgment, from which the O'Hanlon's appealed. The judgment was reversed by this Court in 1846, (9 Mo. R. 810,) because the entry of Perry, on its face, purported to have been made under the pre-emption clause of the act of congress of July 9, 1832, and was made on the 26th Nov. 1839, long after the expiration of the law and the time allowed by it for such entries. On the second trial, which took place in 1847, the title of Perry was as follows:

In 1807, Perry as assignee of Basil Valle, filed his claim with the recorder of land titles, for 639 acres of land at Mine a Breton. This claim was rejected by the first board of commissioners. A portion of the land embraced in this claim was supposed to be confirmed to Perry by the act of 13th June, 1812, or of May 26, 1824, as a lot appurtenant to the village of Mine a Breton, and accordingly in 1825, Perry procured from the recorder a certificate of such confirmation. This part of the 639 acres was that portion upon which Perry's dwelling house and improvements were located. By the act of congress of March 2, 1833, the board of commissioners appointed under the act of July 9, 1832, were authorized and required to examine claims founded on settlement and cultivation, as well as such as were founded on incomplete grants. Perry's claim was embraced within this provision, and testimony was taken before the board in relation to it. Before any action of the board was had upon this claim, Perry, in 1834, attempted to avail himself of the pre-emption privileges granted to the claimants who were willing to waive their claims and relinquish to the United States. He accordingly executed his deed of relinquishment for the 639 acres, (including the ten or twelve acres which had been confirmed to him by the act of 1824,) which was duly filed in the office of the recorder of land titles, and an abstract of which was duly transmitted to the register and receiver at Jackson. In September, 1834, before the expiration of the time allowed by the act of 1832, Perry applied to the register and receiver at Jackson to enter the 639 acres. The application was refused, on the ground that the surveys were yet incomplete. In 1836, after the surveys had been completed, application was again made, but the application was refused, on the ground that the law had expired. In 1839, the subject was brought to the notice of the head of the department, and the officers at Jackson were advised, that when application had been made in due time,

and entries were not permitted for want of surveys, or from any cause not attributable to the fault or negligence of applicants, it was the custom of the department to permit such entries to be made, notwithstanding the expiration of the law. Perry was accordingly permitted to enter—not the whole tract which he had relinquished and which he again offered to purchase, but so much of it as was not embraced by the confirmation of 1824. It appears, that subsequent investigation satisfied the commissioner of the General Land Office, that Perry was not an actual settler upon the land he was permitted to enter, and therefore in 1843, he directed Perry's certificate of entry to be cancelled. A patent issued to the defendants, or some of them, in 1847.

When this case was before this court in 1846, there was no evidence to explain the circumstances under which the entry of the plaintiff was made. The present record contains the evidence. The certificate was issued under the act of July 9, 1832, and was dated in 1839. It appears that it was not by reason of any fault of the plaintiff that the entry was not made in time. Perry's application to enter was before the expiration of the law, but his application was rejected, because the public surveys in that quarter were not finished. A reference to the various communications from the heads of the land department, and official opinions of their legal advisers, will show that under similar circumstances it was the uniform custom of the department to permit such entries. Indeed this construction of the pre-emption clause in the act of 1832, and of other pre-emption laws, commends itself to every idea of justice and right. Any other construction would have the effect to deprive pre-emptors of the privileges secured to them by law, because of the delays of the government agents. When congress fixes a limit to the period, within which pre-emptors may avail themselves of the benefit of the act in which the limitation is made, and the pre-emptor has, within that time, done every thing in his power to comply with the law, it is clearly not the intention of congress that the right of pre-emption shall be lost through the delays of the officers to whom the disposition of the public lands is entrusted. The limitation is upon the pre-emptor, not upon the government agents. Such was the construction given to the pre-emption clause in the act of July 9, 1832, and Perry was accordingly permitted to enter in 1839. This entry was legal and proper, under the circumstances, and invested him with a title upon which he could maintain an action of ejectment.

But in 1843, the commissioner of the General Land Office cancelled this entry, and we are called upon to determine the effect of this can-

cellation. It is said that this act of the commissioner had the effect to make Perry's entry null and void from the beginning, whether the act was in pursuance of the laws of the United States or not; that the commissioner of the Land Office is invested by law with a general superintending control over all the subordinate officers in the land department; that his action is subject to the revision of the Secretary of the Treasury, but its propriety or legality cannot be examined by this Court; that neither this Court nor the federal courts have any jurisdiction over the matter; and that if the federal courts have, the courts of this State have not, and that an exercise of such jurisdiction would be an interference with the primary disposition of the soil secured by compacts and constitutional obligations to the federal government.

When titles emanate from the federal government, for lands lying in this State, whether those titles be inchoate or perfect, our courts must determine upon their validity. If controversies involving the validity of land titles in this State are to be determined at all, they must be decided here. There is no other court invested with original jurisdiction. Congress has not thought it expedient to establish tribunals within the States to determine controversies between citizens of the same State, although their determination may depend upon the construction of acts of congress or treaties made by the federal government. By the 25th. section of the judiciary act, the ultimate revision of such questions is reserved to the Supreme Court of the United States, but no branch of the federal judiciary has been invested with original jurisdiction in such cases. Shall our citizens then be without redress in all controversies that involve their land titles? All the titles to land in Missouri, with inconsiderable exceptions, have emanated from the federal government; only two or three *complete Spanish grants* are located within the limits of this State. Such controversies, therefore, cannot be decided without undertaking to construe the laws of the United States, and determining upon the acts of their officers, purporting to be authorized by these laws.

Shall we concede that the commissioner of the General Land Office or the Secretary of the Treasury, by virtue of their revisory power over the subordinate agents concerned in the sale of the public lands, may *at their will and pleasure,* annul or cancel any title to land; that their action is final and conclusive; and that no redress is to be had in the courts of justice, however arbitrary or illegal such action may be? It would be a reproach upon our system of government if this were so. We profess to live under a government of laws, and the rights of the humblest citi-

zen are supposed to be independent of the arbitrary will of any officer, however high. The officers of the federal government derive their authority from the laws of that government, and when their acts are not in conformity to law, they cannot prejudice the rights of others. Whether the law has been complied with or not, is necessarily a question for the judicial tribunal having jurisdiction of the case, in which the question arises. If the courts have no power to look into the authority of the officer, then his act is conclusive, and his errors or frauds are beyond redress.

We do not mean to intimate, that there may not be many acts of the officers of the federal government, to whom are entrusted the management of this branch of the public service, which are purely discretionary, and consequently not subject to revision. This is the case in all of the general pre-emption acts passed by congress, from 1814 up to 1843. Congress declared in these acts, that the right to a preference in the purchase of lands should be determined by certain officers designated in the law, and that such right should be proved to the satisfaction of such officers. We have uniformly maintained, that in such cases the courts cannot interfere. The register and receiver, are by law entrusted with the power of deciding whether A or B is entitled to a pre-emption. The right must be established to the satisfaction of these officers. No other tribunal can undertake to revise their decision, because the law expressly invested them with the *sole* power. If, therefore, the register and receiver grant a pre-emption to A, it is not in the power of the courts to say that B is entitled to the same pre-emption. But when the title has emanated, and an entry permitted, the courts must decide upon its validity, when brought in conflict with other titles emanating from the same source.

The commissioner of the General Land Office is undoubtedly authorized to superintend and revise the proceedings of the register and receiver, and where an absolute discretion is given to the register and receiver, the commissioner may, perhaps, direct in what manner that discretion shall be exercised, and the action of the register and receiver, in accordance with the instructions of the commissioner, may be considered conclusive. The act of July 9, 1832, gave no such discretion, either to the receiver and register, or to the commissioner. So far as it relates to the class of claims in which that of the plaintiff was embraced, there was no discretion left to either class of officers. There were no facts *in pais*, the existence of which was essential to the allowance of the

pre-emption, and the proof of which was entrusted to the judgment of these officers. Had this been the case, as it was in reference to the second class of claims, and the officers, upon investigation, decided against the claimant and refused to permit the entry, the courts could not interfere. But this was not the case. The entry was permitted, as we have seen. Was the commissioner, then, authorized by law to vacate it?

The ground upon which the plaintiff's entry was cancelled was, that he was not an actual settler or housekeeper upon the land. An examination of the act of 1832, will show that this was of no consequence to Perry's pre-emption right. There were two classes of claims embraced by the proviso to the third section; first, claims which had been rejected by the board; and, second, those which had not been rejected. Claimants of the first class were allowed a pre-emption, provided they were actual settlers and housekeepers upon the rejected lands. Claimants of the second class were allowed a pre-emption, whether actual settlers or not, provided they would waive their claims and relinquish to the United States. Such was the construction which the head of the land department, at the passage of the law, gave to it. In the instructions to the commissioners, dated Nov. 7, 1832, the commissioner of the General Land Office says: "The third section of the act provides that actual settlers, being housekeepers at the date of the act, upon such claims alledged and filed in the mode specified by the first section, as are rejected, and who claim to hold under such rejected claim; *and also*, that all claimants *who may relinquish to the government* claims of the character designated in the first section of the act, *prior to any decision thereon* by the board, shall have the right of pre-emption," &c. The commissioner further says: "The recorder is hereby required to furnish the party relinquishing with a certified copy of his relinquishment, *which shall be the evidence of his right to the pre-emption privilege* intended to be conferred by the act." In his instructions to the registers and receivers, the same officer says: "This relinquishment of claim will be made by the party with the register of land titles at St. Louis, who will furnish you, on the first of each month, with an abstract detailing in full all the particulars of each claim in your district relinquished under the provisions of the act; and such claimants will receive from the recorder a certified copy of his relinquishment, *as evidence of his right to a pre-emption,* and which is to be filed in your office at the time the pre-emption right is applied for "

The propriety of this construction thus given to the act by the officers to whom its execution was entrusted, is manifest. The rejected claims were by the act declared to be public lands from the time of their rejection by the board, and no relinquishment was necessary to vest the title to them in the United States. The claimants were then in the condition of those who had no claim upon the bounty of the government except they were actual settlers upon the lands rejected. Actual settlement had been long regarded by congress as a meritorious claim to a preference in the purchase of the public lands, and actual settlement was therefore the basis of the pre-emption right granted to the rejected claimants. The case of the claimants whose claims were still under consideration, was altogether different. They might be confirmed, and in that event, the federal treasury would derive no benefit from them. Congress therefore proposed to these claimants, that if they would relinquish their claims, they should have the right to enter the lands claimed at the minimum price, in preference to all others. This was the inducement held out to them to relinquish their claims. Actual settlement had nothing to do with it. The deed of relinquishment was the evidence of their pre-emption right, and the only evidence required.

Let it be assumed, however, that this construction of the law was wrong, and that the commissioner was right in supposing that Perry's pre-emption right depended upon his being an actual settler and housekeeper upon the land he relinquished. How were the facts as they appear upon the record? Perry was an actual settler and housekeeper upon the land he relinquished. He was not an actual settler and housekeeper upon the land he entered, because he was not permitted to enter the whole tract, although he offered and desired to do so. He was not allowed to enter the whole tract relinquished, upon the ground that a portion of it, that portion upon which his dwelling house and improvements were located, had already been confirmed to him by the act of congress of May 26, 1824. But here was a mistaken kindness on the part of the government officers. Perry had executed his deed, relinquishing to the United States his title to the whole tract. It was not material how Perry's title stood, whether it had been confirmed to all the land, or a part, or to none; he relinquished it to the United States. The act of 1832, authorized him to do so, and he followed the directions of the law. Shall he be now told that he is no settler and housekeeper upon the land, when the mistakes of the federal officers *alone* have placed him in this predicament? If he is not an actual settler upon the land entered, it is because he was not permitted to enter the entire tract he

claimed. The officers refuse to let him enter the ten or twelve acres upon which his dwelling house stood, upon the assurance that it is already his, and after the remaining part of the tract is entered, he is told that he is not an actual settler and housekeeper upon the land entered, and that therefore his entry must be cancelled!

If illustration were necessary, the facts of this case would seem to show the extreme impolicy of declaring to the federal officers, who are entrusted with the sale of the public lands, that their acts are beyond the reach, and above the scrutiny, of courts of justice. If the commissioner of the General Land Office, upon an *exparte* proceeding at Washington, can annul or vacate the incipient titles which have been created by the subordinate agents of the government, without authority of law or against the express enactments of congress, nine-tenths of the titles to lands in this State are at the mercy of an irresponsible officer. This cannot be so. There is no pretension that the courts of this State can control the conduct of these officers. If the circumstances of the case admitted of any interference, upon the principles of law, appliable to mandatory writs, such redress, beyond doubt, belongs exclusively to the federal judiciary. But when these officers have acted, and their action forms the basis of a title, we then look to the *law* as well as the *act*, in order to determine its validity. In examining such questions, we are influenced by no law of this State. We examine them upon the same principles that would determine the federal courts, if they had jurisdiction. The laws of the United States, under which the officers profess to act, are the laws by which the validity of those acts are judged. If errors are committed by the State courts in the determination of such questions, they will be corrected by the Supreme Court of the United States—by which tribunal such cases must finally be decided.

We are unable to perceive any legal grounds upon which the commissioner of the General Land Office could undertake to vacate Perry's entry. We have seen that throughout the whole transaction, there was a strict and literal compliance with the act of congress, on the part of Perry, and that all the difficulties, delays and blunders were produced by the officers of the government. Perry had a claim which had been filed according to law, in 1807; he presented it to the board of commissioners under the act of 1832, and it was a claim, which by the supplemental act of 1833, was properly cognizable by them. Whether this claim had any merit either in law or equity, is of no consequence. The board did not reject the claim. The act of congress proposed to him, that if he would waive his claim, he might enter the land at the minimum price. He ac-

cepted the proposition; relinquished his claim, and executed a deed to the United States. He presented a copy of this deed to the land officers of Jackson, as his evidence of a pre-emption right under the act of 1832. He was not permitted to make the purchase, on the ground that the surveys had not been made. He applied a second time, but his application was refused, because the law had expired. Finally he was permitted to make the entry; but subsequently to this, another officer cancels the entry, because he was not an actual settler.

A bare statement of the facts, viewed in connexion with the provisions of the law, is sufficient to show that this cancellation was inoperative, unless we adopt the principle that the commissioner may, by his mere volition, without regard to the mandate of the law, annul the titles which have emanated from the government. Perry's entry, then, in 1839, was not affected by the subsequent action of the commissioner, and this conclusion is sustained by the several decisions of this court which have been heretofore made upon the questions we have just been considering· Stephenson vs. Smith, 7 Mo. R. 610; Groom vs. Hill, 9 Mo. R. 323; Allison vs. Hunter, ib. 749; T. & J. O'Hanlon vs. Perry, ib. 804; Pettigrew vs. Shirley, ib. 683; Lewis vs. Lewis, ib. 183.

But matters were not permitted to remain in this position. In 1847, a patent was issued to the defendants for this same land. In what mode the land was brought into market does not appear, nor is it material that it should. The patent is the consummation of the title, and authorizes the presumption that all the pre-requisites of the law have been complied with. "But," as Judge Marshall has said in the case of Polk's lessee vs. Wendell, (9 Cranch, 95,) "there are some things so essential to the validity of a contract, that the great principles of justice and law would be violated did there not exist some tribunal to which an injured party might appeal, and in which the means by which an elder title has been acquired might be examined." "There are cases in which the grant is absolutely void; as, where the State has no title to the thing granted, or where the officer has no authority to issue the grant. In such cases, the validity of the grant is necessarily examinable at law." It was admitted by this Court in the case of Barry vs. Gamble, (8 Mo. R. 88,) that a location upon lands expressly reserved from sale could not be available against a subsequent confirmation of the reserved lands, under the act of May 26, 1824. The same principle was conceded in the case of Sarpy vs. Papin, (7 Mo. R. 503,) though in this last case, the proviso to the second section of the act of July 4, 1836, under which the confirmation was made, was understood to impart vitality to all locations and sales

which had been made of the reserved lands, and whether these locations and sales had previously to the passage of that act been valid or invalid, that proviso was believed to recognise their *physical* existence at least, and gave them sufficient validity, if they had none before, to prevail against the confirmations under the act. This construction was thought to be essential to give effect to the object of the proviso. But the supreme Court of the United States in Stoddard vs. Chambers, went further, and not only recognized the general principle that locations and sales of lands reserved by the act of congress were void, but applied the principle to the proviso to the 2nd section of the act of July 4, 1836.

By this means the effect of that proviso was limited to protect only such titles as had originated during a short interval, between the expiration of the act of May 24th, 1828, and the passage of the act of July 9, 1832. How far the construction conformed to the *spirit* of this law, and the recommendations of the commissioners, upon which it was based, is not for us to determine. A case involving the same question is, we learn, again before that court, and we cannot anticipate what may be their final decision upon this point. Whatever it may be, the general principle asserting the invalidity of an entry or location of land expressly reserved from sale by an act of congress, is distinctly recognized in the case of Stoddard vs. Chambers. The same point had been previously established in Wilcox vs. McConnell (13 Peters.) There can be no difference, in principle, between the validity of a patent in such cases, and an entry or location. A patent is the highest evidence of title, but the executive officers of the government can no more convey land, which congress has reserved, by patent than by any inferior evidences of title. The principle upon which the entry or the location is avoided, applies as well to the patent, as it does to the inferior grades of title. The officers have no authority to make the sale. They are expressly prohibited from doing so.

What then was the condition of the land, the title to which is now in controversy, in 1847, when the patent issued?

The act of July 9, 1832, directed the commissioners to divide the claims submitted to them, into two classes. The first class was to embrace such claims as, in their opinion, were meritorious and ought to be confirmed; and the second class, to include such as were destitute of merit. The act declared, that after the final report of the board, the lands embraced in the second class, should be subject to sale as other public lands; that the lands contained in the first class should be reserved from sale until the final action of congress thereon. Congress finally

acted on this report in 1836, and the act of July 4, 1836, confirmed the claims recommended by the commissioners, with certain exceptions specified in the act. Perry's claim was not in the second class, for it was never rejected by the board; it was not in the first class, for it was not reported for confirmation. How then has the reservation been removed?

By the act of 1832, this land was expressly reserved from sale. No proceeding under that act has had the effect of taking off this reservation, nor has any subsequent law been enacted having any such purpose or tendency. If Perry then, by virtue of the proceedings which were had under the proviso to the third section, failed to acquire a complete title to the land by purchase, it still continues under the general reservation. Whether Perry's title be good or otherwise, until congress shall direct that the land be brought into market, no other individual can acquire a title. It was expressly reserved on account of Perry's claim under Valle. That reservation still remains.

It is true that Perry relinquished this land to the United States in 1834, but that relinquishment was made for the purpose of securing his pre-emption privilege under the 3rd section of the act of 1832. If the pre-emption right be denied, Perry's deed of relinquishment cannot prejudice his claim. The executive officers cannot *uno flatu* pronounce in favor of the relinquishment and against the pre-emption. In any view of the subject, the deed of relinquishment would not affect the reservation. It only conveyed Perry's title to the United States. If the United States think proper to reserve land for their own use, the reservation is as binding as though it was made to fill the claim of a private citizen, and the executive officers of the land department cannot dispose of the land so reserved. Wilcox vs. McConnell, 13 Peters.

The patents issued to the defendants in this case cannot avail them. In coming to this conclusion, we will not be understood as denying or questioning the general principle, which has often been determined by the Supreme Court of the United States, and as often recognized by this Court, that a patent is the *better title* within the meaning of our act regulating the action of ejectment. We hold the patents in this case to be void, and of course, the principle alluded to is inapplicable.

The other Judges concurring, the judgment of the Circuit Court will be reversed, and the cause remanded.