IN

# THE SUPREME COURT

OF

# THE STATE OF MISSOURI,

OCTOBER TERM, 1866, AND MARCH TERM, 1867, AT ST. LOUIS.

————————◆————————

CHARLES GIBSON, Respondent, *v.* CHARLES P. CHOUTEAU *et als.*, REPRESENTATIVES OF PIERRE CHOUTEAU, JR., Appellants.*

1. *Conveyance—Recording—Notice.*—The statute of October 1, 1804 (1 Ter. L. 46, § 8), did not avoid unrecorded deeds as between the parties thereto, but only as to subsequent purchasers and mortgagees for a valuable consideration; as between the parties and their heirs the deed operated as a conveyance to pass the title.

2. *Lands and Land Titles—New Madrid Locations—Act of April 26, 1822—Return of Survey to Recorder.*—The act of Congress of April 26, 1822, in requiring that all warrants should be located within one year from the passage of the act, applied only to such acts as the owners of New Madrid claims could themselves do, and not to the action of the public officers of the Government. When the survey and plat of a New Madrid location were made in 1818, and filed in the office of the Surveyor General at that time, the failure of the Surveyor to return the plat of survey to the Recorder of land titles until 1841 did not make void the location. The return of the survey to the Recorder was the duty of the Surveyor General, and not of the claimant.—Easton v. Salisbury, 21 How. 426, commented on.

3. *Lands and Land Titles—Surveys—Public Officers—Jurisdiction.*—When the survey of location or claim is once made officially and approved, the officers of the Land Department have no authority to set aside or annul such sur-

————————

* This case was heard at October term, 1866, and judgment affirmed. A motion for rehearing was made and sustained. The case was again heard at March term, 1867, and the judgment was reversed.

veys on the ground that the interferences with other surveys are not presented on the plat. It is the province of the courts to determine judicially between conflicting titles to the same land. Surveys are merely. evidence of location and boundary, and decide nothing as to superiority of title. Where an individual in the prosecution of a right does everything the law requires him to do, the law will protect him against the neglect, misconduct or unauthorized acts of a public officer.

4. *Lands and Land Titles—Patent—New Madrid Location—Assignee.*—A patent may issue to the assignee of a New Madrid location and will pass the legal title, the presumption being that, when the patent issues, all the acts necessary to its validity have been properly done; but the defendant in a suit may show that he was one of the legal representatives of the original locator, or that he has an equitable title to the land described in the patent.

5. *Conveyance—Estate—Granting Words— Estoppel — Covenants — Warranty.*— The words "*bargain, sell, release, quit-claim and convey*" are words of release and quit-claim merely; they carry the grantor's interest and estate in the land, but do not purport to do anything more. The statutory covenants created by the words "grant, bargain and sell" do not operate as the ancient common-law warranty to transmit a subsequently acquired title. A deed purporting to convey a fee simple absolute, so as to pass a subsequently acquired title under the statute, must undertake to convey an indefeasible title; and must undertake to convey not the grantor's interest in the land, but the land itself, and in such a manner that the grantee is not to be disturbed by any one. A deed conveying the "*right, title and interest*" of the grantor can have no other or greater effect than a deed of release and quit-claim.

6. *Lands and Land Titles—Patent—Relation — Limitations.*—Where the equitable title has passed from the United States, the legal title evidenced by a patent will relate back to the emanation of the equitable title, so that the limitation created by an adverse possession under the statutes of the State will commence to run from the emanation of the equitable title. When the survey of a New Madrid location is returned to the Recorder of land titles, an exchange of lands is effected between the Government and the locator, and the equitable title passes from the United States, and from that date a party in possession of the located land may prescribe as against the New Madrid locator.

7. *Practice — Decree— Infant—Guardian.*—The decree of a court of chancery against an infant, based upon the appearance of the infant by his guardian, without any previous service of process upon the infant, is void, and the infant cannot be bound by such decree. The infant heir can not appear and answer by his general guardian only.

*Appeal from St. Louis Land Court.*

The chain of title was as follows:

1. Confirmations to James Y. O'Carroll for 1,000 arpents, 13th March, 1806; reduced on 14th December, 1810, to 350

arpents, and extended by Recorder of land titles to 640 acres in 1815, and finally confirmed on the 29th April, 1816, to James Y. O'Carroll and his legal representatives.

2. Deed, acknowledged and recorded, from James Y. O'-Carroll to George Ruddell, of 1805, for confirmation, and for all the land.

3. Geo. Ruddell to Jas. Tanner and And. P. Gillespie, Mar. 7, 1866, for 550 arpents in Little Prairie township, New Madrid county, on the waters of the Mississippi, it being a part of the said tract of land originally claimed before the U. S. Commissioner of land claims for the Missouri Territory, by and in the name of Jas. Y. O'Carroll, as reference being had to the Recorder's office or for land claims for the Missouri Territory, &c., which has been materially injured by earthquakes, and assigns right to locate lands in lieu thereof under the New Madrid act of 1815.

4. Deed of George Ruddell and wife to And. P. Gillespie, of New Madrid, for $500 of land in Little Prairie township, described as "one tract of 200 arpents, situate on the Mississippi, or near the Mississippi, it being part of the James Y. O'Carroll's settlement right," duly acknowledged and recorded, dated 16th May, 1818.

5. The general assignment of A. P. Gillespie to Jas. Tanner of all his interest and title in the O'Carroll claim, and other lands, acknowledged 18th May, 1816, and duly recorded.

6. Deed of A. P. Gillespie to Jas. Tanner, 1st June, 1818, for the 200 arpents, a part of the settlement right of Jas. Y. O'Carroll, situate in the county of New Madrid and township of Little Prairie.

7. Geo. Ruddell to George Dameron, 1st November, 1815, a part of a tract of land of 200 arpents situate in the Little Prairie township, county of New Madrid, &c. This deed was held void for uncertainty in the case of Holme v. Strautman, 35 Mo. 293.

8. Deed of Rachael Dameron, William Nelson and John Dameron, heirs of George Dameron, to James Tanner, the

tract of 200 arpents last above conveyed to George Dameron on the 18th October, 1816.

The foregoing was the chain of title in New Madrid county as the same appeared of record there, and the title to the Jas. Y. O'Carroll head right thereby vested in James Tanner.

Chain of title in St. Louis county:

1. Deed of James Tanner to Christian Wilt, dated 31st January, 1816, duly recorded.

2. New Madrid certificate No. 150, of November 30, 1815. The J. Y. O'Carroll's land has been injured by earthquakes.

3. Location of certificate, November 8, 1816, by Christian Wilt, with description of land located.

4. Certificate of Joseph C. Brown, agent of Christian Wilt, of location on fractional sections 20 and 17, west half of fractional section 21, and north side of fractional section 28, in the same township (45 N. and range 7 E.) in which St. Louis is situated—June 16, 1818.

5. U. S. survey of O'Carroll's New Madrid location as made for Christian Wilt in April, 1818, by Jos. C. Brown, Dep. U. S. Surveyor. This survey was not returned to the Recorder of land titles until 1841.

6. Deed of Hempstead, guardian of Wilt, only son and heir of Christian Wilt, deceased, to Joseph Hertzog, surviving partner of Hertzog & Wilt, dated 10th September, 1821, for the 640 acres in the New Madrid location for Christian Wilt, No. 150, &c. This deed was made pursuant to a decree of the Court of Chancery, entered at the August term thereof at St. Louis in 1821.

7. The record of said decree in chancery in Hertzog v. Wilt—Circuit Ct. of St. Louis sitting as a court of chancery, August term, 1821. By this decree Hempstead, the guardian of Geo. W. Wilt, is ordered to convey the real estate, including this New Madrid location No. 150, to Jos. Hertzog. The guardian was appointed without any service of process upon the infant.

8. Jos. Hertzog to Robert Wash, trustee for Louis Devo-

tion, deed of trust of 26th October, 1822, of this New Madrid location No. 150 and other lots of land to secure $9,549 due Devotion by Hertzog, with power to Robert Wash to sell on ten days' public notice a part or the whole of the land.

9. Louis Devotion, by trustee R. Wash, to P. Chouteau, Jr., for $128, the 64 acres now sued for, dated November 27, 1824. In 1826 Pierre Chouteau entered under this deed, and has held ever since until his death in 1865.

10. Deed of Jos. Hertzog, by sheriff, to Henry Clay, executor of James Morrison, dated May 17, 1825; of the New Madrid certificate No. 150 and location 640 acres, and other lands sold under execution.

11. The deed in chancery in case of Henry Clay against Christian Wilt and Joseph Hertzog's heirs and Rob't Wash, vesting the title in the New Madrid location No. 150, 640 acres, as against the parties named, in Henry Clay, executor of William Morrison.

12. Title bond or agreement from Henry Clay to William McRee to convey him the New Madrid location No. 150, 640 acres.

13. Deed from Henry Clay to the heirs of William McRee, October 11, 1839, for $500, conveying the 640 acres of land (New Madrid location No. 150 of Jas. Y. O'Carroll) to Ann McRee, James F. McRee and Samuel McRee, heirs of Wm. McRee.

14. Deed of Ann F. McRee, Jas. M. McRee and Mary A. McRee to Samuel McRee, of 4th July, 1836, for the sum of $1,600; grant this New Madrid location No. 150 of 640 acres to Samuel McRee and his heirs. This deed states the death of Wm. McRee before February 4, 1836; so that Hy. Clay's sale of the land in N. M. certificate 150 to Wm. McRee must have been before the 4th February, 1836.

15. Bill in chancery filed by Samuel McRee in 1845 against the heirs of Wilt and Hertzog, and Ed. Hempstead et als., to cure the defect in old bill of 1821 by Hertzog v. Hempstead, guardian of Geo. W. Wilt, heir of Christian Wilt, in which there was no service on the heir at law of Chr. Wilt; the loca-

Gibson v. Chouteau's heirs.

tor of N. M. certificate 150.   In this last bill the title of Chr. Wilt to N. M. certificate No. 150 under James Y. O'Carroll was asserted, and Sam'l McRee was decreed to be the sole owner of the N. M. certificate No. 150 under Jas. Y. O'-Carroll.

16. Samuel McRee, claiming to be the sole owner of the 640 acres in Jas. Y. O'Carroll's N. M. certificate No. 150 in favor of Chr. Wilt, he and his wife make a deed to Pierre Chouteau, Jr., and his heirs, on the 30th August, 1838, for the 64 acres which Mr. Chouteau had acquired of Robert Wash, trustee of Louis Devotion, in 1824, all duly acknowledged and recorded at the time.   These are the 64 acres in suit.

17. Samuel McRee died, and devised all his real and personal and other property to his wife; will probated in 1849.

18. Mary McRee, widow of Samuel McRee, and his sole devisee, is the party to whom the patent of 1862 is issued as the assignee of Jas. Y. O'Carroll.

19. Mary McRee to plaintiff.

*B. A. Hill* and *Shepley*, for appellants.

I. The patent and location are void, no survey being returned to the Recorder of land titles until 1841—Easton v. Salisbury, 21 How. 427; Hale v. Gaines, 22 How. 144; Wilcox v. Jackson, 13 Peters, —; Bagnell v. Broderick, 13 Peters, 447.   This is a rule where a prior title exists by law, or a prior reservation exists.

II. The patent survey and location are void, because the location was not made on public lands, the sale of which was authorized by law—New Madrid act of 17th Feb. 1815, p. 255, § 1.

By the act of 13th June, 1812, " the rights, titles and claims to town or village lots, out-lots, common-field lots, and commons in, adjoining and belonging to the several towns or villages of   *   *   *   St. Louis,   *   *   *   in the Territory of Missouri, which lots have been inhabited, cultivated or possessed prior to the 20th day of December, 1803,

35—VOL. XXXIX.

shall and the same are confirmed to the inhabitants accord--
ing to their several rights, or rights in common, thereto,"
*   *   *   And the said act of 1812 commands the U. S.
Surveyor "to survey and mark the outboundary lines of
the said several towns or villages, so as to include the out-lots,
common-field lots, and commons thereto * * * belonging."

The outboundary of St. Louis, the out-lots, common-field
lots, and commons thereto belonging, even according to said
act of 1812, must include all of the Jas. Y. O'Carroll loca-
tion; and all the lots and commons being granted to the
inhabitants, and all the vacant lots within said area not re-
served for military purposes by the President of the United
States, shall be reserved for the support of schools in the
village of St. Louis, not exceeding one-twentieth part of the
whole lands included in the general survey of said town or
village.   This outboundary is to be a general line to sur-
round the town or village, and all the commons, and common-
field lots, and all the vacant lands, and the reservation is
absolute in the present tense, and takes effect *eo instanti* upon
the vacant lands lying between the common-field lots, and
in other places within the whole range of lots and commons
in, adjoining, and belonging to, the town or village of St.
Louis.

In Glasgow v. Hortez, 1 Black, (U. S.) the reservation for
the schools and military purposes is equally positive and
absolute as the grant to individuals.   It is a reservation in
the present tense, and not any reservation to be made there-
after.   It was then and there reserved for certain purposes
declared, and it has remained so reserved ever since, and
such land is not subject to sale.

The New Madrid locations can only take effect upon public
lands the sale of which was authorized by law—Act of Feb.
17, 1815, 1 Land L. 255, § 1.   Now then vacant lots in the
common fields of St. Louis, between the common fields of
the *cul de sac* and the common fields of the Barrière des
Noyers of St. Louis, were reserved from all sales by express
legislation of Congress.   And the location of the New Madrid

certificate was in the very face of the statute, and was void *ab initio*, so that the plaintiff has no title under the New Madrid certificate or patent—Stoddard v. Mills, 8 How. 365 ; Stoddard v. Chambers, 2 How. 284 ; Lessieur v. Price, 12 How. 72 ; Easton v. Salisbury, 21 How. 427 ; Fenn v. Holme, 21 How. 481 ; Bissell v. Penrose, 8 How. 317 ; Hale v. Gaines, 22 How. 214 ; Barry v. Gamble, 3 How. 51.

By the act of Congress of March 21, 1866, passed after the trial of this case, the title that may remain in the United States, if any, is granted to James Y. O'Carroll, or his legal representatives, and defendants are clearly the legal representatives for the land sued for. Before the act of 1866, the land was clearly within the reserving section of the act of June 13, 1812, § 2.

III. If the patent be not void, and is valid to pass the title of the United States, then the defendant is entitled to the sixty-four acres in his possession under the Calve U. S. survey and confirmation, and under the patent to Mary McRee, as assignee of James Y. O'Carroll, for the following reasons :

(*a*) Because Pierre Chouteau is the assignee by mesne conveyances of Jas. Y. O'Carroll, and of the locators of the land under said Jas. Y. O'Carroll and his legal representatives, for sixty-four acres.

Samuel McRee, and Mary McRee the present plaintiff, conveyed this very land in suit to Pierre Chouteau, Jr., on the 30th day of August, 1838, by deed of bargain and sale, release and quit-claim, in fee simple absolute.

Mary McRee claims the New Madrid location and patent, as devisee of her husband Samuel McRee. Samuel and Mary McRee, the grantors in 1838, conveyed to Chouteau the same sixty-four acres now sued for.

Points on the New Madrid patent, and examination of the effect of the patent :

I. The only pretence of claim by the plaintiff arises upon the recitals in the patent that Mary McRee is the owner by deraignment of title from James Y. O'Carroll of the land in

question. She is really the owner of 576 acres of the New Madrid location, and Pierre Chouteau died seized of 64 acres of the same location, under the same title of Samuel McRee.

II. By the patent certificate the Recorder of land titles, March 26, 1862, declared "that James Y. O'Carroll, or his legal representatives, is entitled to receive a patent for the aforesaid survey, No. 2498, saving and excepting 'therefrom' the interfering claims." This patent certificate was issued under the act of February 17, 1815, § 3, and it leaves no discretion in the hands of the Commissioner of the General Land Office, but requires him to issue a patent to James Y. O'Carroll, or his legal representatives, according to the long established custom of the office—5 Mo. 147; Atty. Gen. Wm. Wirt's opinion, May 11, 1820, 2 Pub. Land Laws, p. 9; B. F. Butler's opinion, May 7, 1836, 3 id. p. 95. By the universal custom of the General Land Office the patents on the New Madrid patent certificates have always issued, before this one now sued on, in the name of the original owner of the injured lands, and his legal representatives. By the 1st section of the act of February 17, 1815, it is the person whose lands were injured by earthquakes that is directed to make the location, and this is the same person to whom the patent shall issue—1 Pub. Land L. 255.

Jas. Y. O'Carroll was the person to whom the final confirmation for 640 acres was made, April 29, 1816; he had conveyed to Geo. Ruddell the inchoate title, but the legal title from the United States passed by the confirmation to Jas. Y. O'Carroll, and the original certificate of the Recorder in 1812 was issued to Jas. Y. O'Carroll.

III. Congress alone has power to grant the public domain. By law this New Madrid title must pass to the legal owner of the lands in 1815, when the act for relief was passed; and so it must pass to Jas. Y. O'Carroll, or his legal representatives. The patent has no power to affect the title, or to pass the title from the United States, unless it be issued in compliance with law—Strother v. Lucas, 6 Pet. 763; Easton

v. Salisbury, 21 How. 427; Hale v. Gaines, 22 How. 144; Stoddard v. Bissell, 8 How. 365; Stoddard v. Chambers, 2 How. 284; Barry v. Gamble, 3 How. 51.

IV. The patent, by force of the act, must go to O'Carroll, or his legal representatives, or to Christian Wilt. The patent certificate is issued to O'Carroll, or his legal representatives, and the Commissioner of General Land Office, in violation of law and of the patent certificate, issues the patent to Mary McRee and her heirs, as assignee of James Y. O'Carroll. This recital is in violation of law, and the instructions and decisions of the Attorney General, and are not any evidence of title in Mrs. McRee and her heirs, or grantee. The Commissioner has no power to grant a title that passed by law to O'Carroll, and his legal representatives, to Mary McRee and her heirs, nor has the Commissioner power to try the title between McRee and Pierre Chouteau, or between McRee and O'Carroll. The Commissioner is not clothed with any judicial or discretionary powers by the New Madrid act; he is commanded to issue the patent on the patent certificate—§ 3. The recitals in the patent are not of matters within the province of the Commissioner, or of the President; and so far as these recitals introduced the name of Mary McRee, who is unknown to the record of the United States in this location, No. 150, they are of no force—1 Greenl. Ev. §§ 491–8.

V. The patent on its face shows that O'Carroll is the party entitled, under the act of 1815, to the land included in the New Madrid location, and the deraignment of title must depend on the record evidence thereof. By the laws of this State title to land must pass by deed or by record—R. C. 1855, tit. Conveyances, §§ 45, 35, 25 & 15. Plaintiff stands alone upon the patent to Mary McRee, and the defendants show their title and the plaintiff's title also, under the O'Carroll New Madrid location, for the respective tracts of land occupied by them for a long term of years. By recorded deeds and decrees in equity, the whole title vested in Samuel McRee, under Jas. Y. O'Carroll, and his wife Mary

McRee conveyed the land in suit to Pierre Chouteau, and his title is as good as the deed of Samuel McRee and wife can make it. If Samuel McRee had no title in 1839 to the New Madrid location, he had none at his death, and Mrs. McRee acquired none by his devise.

VI. By the statute of 1855, tit. Ejectment, p. 692, §§ 11 & 12, it is enacted that "the title to the land located by virtue of such (James Y. O'Carroll) certificate or patent (Mary McRee, assignee of O'Carroll) shall be determined according to the rights of the parties to the land as located by virtue thereof." This statute was passed for the purpose of meeting the hardship and technical injustice of the rule established in the case of Bagnell v. Broderick, 13 Peters, and to prevent circuity of action, and an appeal to the court of equity. Sec. 12 of the said act, p. 692, declares that the real owner of the title shall prevail, and that the patent to whomsoever issued shall only be *prima facie* evidence of the title of patentee — Act 1839 and 1845, *in pari materia.* This statute is not ambiguous; it gives the defendant in this action the clear right to defend against the patent to whomsoever issued, and to show who is the real owner of the title to the land located by virtue of such certificate.

VII. The General Assembly of Missouri had full power and authority to declare that such patent shall enure to the benefit of the real party in interest, the real owner of the land injured by the earthquakes, and the real owner of the lands located in lieu thereof. It is a rule of evidence, of property, and of practice in an ejectment suit, in this State, over which the General Assembly has full control, and no valid objection can be made to the validity and efficacy of the act. If, therefore, the patent be held valid against the authority of Lessieur v. Price, 12 How. 72, and Easton v. Salisbury, 21 How. 427, still the title under the New Madrid location or patent, whatever it may be, enures to defendants for the 64 acres conveyed to Pierre Chouteau by Samuel McRee and Mary his wife.

VIII. If the certificate and patent do not enure to the benefit of James Y. O'Carroll, for the reason that his title to the head right had passed to Ruddell, and to Tanner, and to Wilt, the holder of the title to the injured lands, at the time the New Madrid location was made, then the patent would enure to the benefit of Wilt and his grantees—Stuart v. Rector et al., 1 Mo. 361; Mitchell v. Parker, 25 Mo. 256; Holme v. Strautman, 35 Mo. 293. If necessary the court will hold that the legal title passed to Wilt, who caused the location to be made in June, 1818.—Lytle v. Arkansas, 9 How. 314; Lindley v. Hawes, 2 Black, (S. C. U. S.) 554; Bissell v. Penrose, 8 How. 317; Hogan v. Page, 2 Wal. (S. C.) —; U. S. v. Fitzgerald, 15 Pet. 407; Barnard v. Ashley, 18 How. 437; Cunningham v. Ashley, 14 How. 377.

IX. That the deed of Samuel McRee and wife to Pierre Chouteau passed all the title and equity that McRee had in 1838, and all that he acquired by correcting the decree of 1821, by the bill he filed in 1845, is clear. The scope of the bill of McRee in 1845 was to cure errors and defects in the old bill of 1821, and Samuel McRee, grantor in the deed of 1838 to Pierre Chouteau, solemnly avers of record in his bill in chancery that "Christian Wilt purchased, amongst other considerable real estate, * * * a New Madrid certificate, issued by the Recorder of land titles of United States to Jas. Y. O'Carroll, or his legal representatives, No. 150, which was afterwards located by said Wilt as a tract of land, described as follows: (Here follows description.) It being a certain location made by the said Christian Wilt, by virtue of a New Madrid certificate so called, No. 150, dated November 30, 1815, in the name of Jas. Y. O'Carroll, or his legal representatives, all of which will more fully appear by reference to said location; * * * and to the deed of transfer of said certificate from James Tanner, as the legal representative of said O'Carroll to said Christian Wilt, recorded in the Recorder's office of St. Louis county, book 4, p. 237, et seq." This bill in equity, or the decree therein, is ample

proof as against Samuel McRee that he claimed his title under Christian Wilt, assignee of James Tanner, legal representative of Jas. Y. O'Carroll. The deeds in the record are conclusive to the same effect, and the deposition of Branham locates the land.

X. The deed of Samuel McRee and wife to Pierre Chouteau, dated August 30, 1838, is operative as a deed in fee simple absolute for the land described, so as to pass any after acquired title under the 3d sec. of the act of 1835, tit. Conveyances—Bogy v. Shoab, 13 Mo. 365. This deed of McRee to Chouteau contains the following words in granting clause, to wit: "Bargain, sell, release, quit-claim, and convey unto Pierre Chouteau, Jr., * * * and his heirs," the land in suit by description. *Habendum* to Pierre Chouteau and his heirs forever. This deed has operative words of bargain and sale. Every estate of freehold or inheritance in possession in land may be conveyed by bargain and sale, and estates in remainder and reversion may be conveyed by bargain and sale—Fox's case, 8 Coke, 93 ; 2 Greenl. Crui. 98, tit. Deed, ch. 9, § 5, and notes. The words remise, release, and forever quit-claim are sufficient—Jackson v. Fish, 10 John. 456; Fisher v. Field, id. 495, 505. So the words "make over and grant"—Jackson v. Alexander, 3 John. 484. The deed of bargain and sale operates under the statute of uses, and it operates as a contract, by which one person conveys his land to another for a pecuniary consideration, in consequence of which a use arises to the bargainee, and the statute of uses immediately transfers the legal estate and possession to the bargainee—2 Greenl. Crui. 98, tit. Deed, p. 98, ch. 9, § 4. The deed also contains the operative words release and convey. A release is a conveyance of a right to a person in possession. The operation of this release is by way of *mitter le droit*, transferring the right. In this State the want of seisin or possession in the grantor shall not prevent the operation of his deed to pass the title and estate fully to the grantee—R. C. 1845, 1835 & 1825, tit. Conveyances, ch. 32, of 1845 ; 2 Greenl. Crui. 78, and

note, tit. Deed, ch. 6, § 19.   So Greenleaf says that under
that section the release of the owner, though disseized at the
time, is held sufficient in the State of Missouri to pass the
estate.   The last operative word is " convey," which imports
a grant, and is sufficient to pass the title of the grantor—
Patterson v. Carneal, 3 A. K. Marsh. 618.   A release, if
made for a valuable consideration, will be construed to be
any lawful conveyance by which the estate might pass—
Pray v. Pierce, 7 Mass. 381; Russell·v. Coffin, 8 Pick. 148;
1 Shep. Touch. (Preston) 82; 2 Lom. Dig. t. p. 136, s. 97.
It appears that Pierre Chouteau, Jr., had been in possession
of the land described in this deed from 1826, to the day of
his death in 1865.   He was in possession by color of title
under a deed from Louis Devotion's trustee, dated Nov. 27,
1824.   By any fair construction of this deed from McRee to
Chouteau, it purports to convey a fee simple absolute in the
land described, and the title which Samuel McRee acquired
of Henry Clay by deed of Oct. 11, 1839, and of Hertzog's
heirs and others by decree, would necessarily pass under
the statute—R. C. 1845, § 3, tit. Conveyances.   The other
irregularity in the passage of the title occurs in the deed of
Henry Clay and wife to Ann McRee, Jas. F. McRee and
Samuel McRee, heirs of Wm. McRee.   This deed is dated
in 1839, and recites that Wm. McRee had paid Henry Clay
$500 in his lifetime; that the said William was then deceased,
and Henry Clay made a deed to his heirs and representatives.
By a previous deed, dated July 4, 1836, from Ann F. McRee
Jas. F. McRee, and Mary A. McRee to Sam. McRee, it is recited
that Wm. McRee had died intestate, leaving two heirs, Ann
and James, each entitled to one-third, and it appears from the
Henry Clay deed that Samuel McRee was the other heir.
Before the 4th of July, 1836, Wm. McRee had died, and the
last named deed assumes and recites that he had died seized
of the land in New Madrid certificate No. 150.   This deed
of 1836 is a deed of grant, bargain and sale, and purports
to be in fee simple absolute for the land.   Henry Clay, in
1839, admits that Wm. McRee had bought the land and

paid for it in his lifetime, and it is clear enough, and does not admit of argument, that Samuel McRee acquired, under the statute of conveyances quoted, all the title that Henry Clay conveyed to Ann and James McRee in 1839, and as far as Pierre Chouteau, Jr.'s 64 acres were concerned, the title so acquired in 1838 of Samuel McRee enured to the benefit of the grantee Chouteau, and passed immediately to him. It appears, then, that all the title to the New Madrid certificate of location No. 150 for the 64 acres of the west end thereof, acquired by Samuel McRee subsequent to the date of the deed to Pierre Chouteau, Jr., 1838, did pass to Pierre Chouteau, Jr., by operation of the statute of 1835 and 1845.

XI. It further appears from the deed of McRee to Chouteau that the land conveyed " is part of the tract located under a New Madrid certificate issued to James Y. O'Carroll, or his legal representatives." The location being void, the patent being void, there was no title passed by the United States to any one until the act of March 21, 1866, when Congress removed the reservation for the use of schools and military purposes created by the act of June 13, 1812, and granted the original location, No. 150, as surveyed, to Jas. Y. O'Carroll, or his legal representatives. This statute of the United States vests the title by relation to all the land within the New Madrid location, not previously granted by Congress on the 10th June, 1852, to the Pacific Railroad's trustee, in the State of Missouri, in Jas. Y. O'Carroll, or his legal representatives, as of the 16th June, 1818. The conveyances of the parties, while they held the inchoate or equitable title to this New Madrid location, are effectual to pass the title subsequently vested by act of Congress in the legal representatives of Jas. Y. O'Carroll—Landes v. Brant, 10 How. 348.

XII. If it be true, as the authorities seem to prove, that the equitable or inchoate right or claim to a location or confirmation may pass by deed or sheriff's sales, and that the title when vested by the Government will relate back to the inception of the claim or right, or equitable title, then the

long possession of Mr. Chouteau, under the deed of Samuel McRee for the land from 1839 to 1862—23 years—gives Mr. Chouteau the interest, title and right of McRee in the land so possessed as effectually as if McRee's deed had been made when he had all the claims and titles in his own right to this land vested in him—Biddle v. Mellon, 13 Mo.   Such a continuous, notorious and adverse possession is as operative to pass to and vest in Mr. Chouteau the equitable, inchoate right and claim to the location as any conveyance, if the analogy between the case of Landes v. Brant, 10 How. and this case be observed ; that is, if the act of Congress works, as I suppose it does, by relation.   The plaintiff could not recover in this case under the act of Congress, for the legal title was not in Mrs. McRee in 1862, when she sued Mr. Chouteau—Givens v. Gray, 26 Mo. 301.

XIII. By the statutes of this State, the holder of a New Madrid location can sue on it in ejectment.   By the case of Lindell v. Cabanné, 12 Mo., the statute of limitations begins to run when the survey is returned to the Recorder of land titles.   In this case it was returned in 1841—Gray v. Givens, 26 Mo. 301.   If, therefore, the confirmation of the New Madrid location by the act of Congress of 21st Nov. 1866, perfects the original location, and vests the title by relation in Jas. Y. O'Carroll as in Christian Wilt in 1815 or in 1818, then Mr. Chouteau's long possession gives him the title to his 64 acres, as against the devisee of Samuel McRee or the plaintiff claiming under him.

XIV. If the several acts of location, viz., the New Madrid warrant, the survey, and patent certificate, had any vitality and value, they did not belong to Mary McRee but to Mr. Chouteau ; and if they could be perfected into a title that could only be done for the benefit of the honest and lawful owner.   So far as the land in dispute is concerned, Pierre Chouteau was the owner of it, and of the New Madrid certificate conveying it.   It was his title that was patented, and the patent related back to the date of the location, and must be considered as dated then.   It was his interest in said

certificate that was surrendered and taken up at the Land Department when the patent issued. The whole consideration received by Government for said patent, so far as the land in controversy is concerned, moved from Chouteau. Mary McRee surrendered nothing—had nothing to surrender. The plaintiff contends that certificate No. 150 and survey No. 2498 were void as against the United States when the patent issued. Concede it; still they did not belong to Mary McRee; they could not enure to her; they were the property of Mr. Chouteau; and if for them the land has been patented, the benefit must enure to him. The case is simply that where one seeking to purchase land for himself pays all the money, and by some mistake, accident or trick, the deed is made to another against his will. The conveyances beginning with that of O'Carroll to Ruddell, and ending with that of McRee and wife to Chouteau, vested in Chouteau an equitable claim to the certificate No. 150 and the location under it by survey 2498, as has been repeatedly decided by this court and by the Supreme Court of the United States. See 21 How. (U. S.) 481, where this identical location was held to be an equitable title. When one person holds an equitable title to land, and another by fraud, accident or mistake, against the will of the equitable owner, contrives to get the legal title in himself, a court of equity will divest that title, and will hold it to be inferior to the equitable title. "There are some things so essential to the nature of the grant, (of the legal title,) that the great principles of justice and law would be violated did there not exist some tribunal to which an injured party might appeal, and in which the means by which an elder title was acquired may be examined"—8 Mo. 94. If a patent has been procured by any fraud or trust, equity will relieve—7 Mo. 610. But it is only after the patent has issued to the wrong party that the court will act; for, till then, the legal title is not in the power of the court—9 Mo. 189. After the legal title has passed out of the Government, a court of equity will investigate the conduct of the land officers, and any concealment

of papers without authority, or other wrong done, will be re-dressed—9 Mo. 323 to 456; 11 Mo. 586 to 592. Nor will these officers be allowed illegally to divest parties of their rights—9 Mo. 573. Any title paper unfairly obtained will be corrected in equity—12 Mo. 333; 36 Mo. 187–93; 18 How. (U. S.) 87. Where a person originally entitled to a bounty from Government assigned it to another, and after-wards took a patent to himself, it was held to belong to his assignee by relation—21 How. (U. S.) 228. The confirma-tion of a claim perfects the same, or a title against the Gov-ernment, but leaves it to its original value when placed in opposition to the rights of another person—11 Mo. 212; 24 Mo. 123. Where several parties claim title to property with which a special tribunal may deal as between one party and the Government, and disregard the rights of others, the latter may come into the ordinary courts of justice and litigate their claims—20 How. (U. S.) 8; 1 Pet. 212; 9 How. (U. S.) 328; 14 How. (U. S.) 377; 18 How. (U. S.) 44. The questions in these last mentioned cases were, (1) whether a party could interpose his equity between the Gov-ernment and its patentee; (2) whether the decisions of officers of the Land Department were conclusive on all per-sons, and even the Government, till judicially vacated. And it was held they were not conclusive, but the equitable rights of parties cut off by issuing a patent, or other official acts, would be set up. The case in 1 Peters, 212, was that of a claim against the Government of Spain, assumed under treaty by United States. The claim was allowed by Com-missioners at the suit of A, and the money was paid to him. Held, the allowance only established the validity of the claim, but not the ownership of A, and that B might recover the money from A by proving his right to it—21 How. (U. S.) 294; 5 Cranch. 591.

*Gibson*, for himself.

I. This patent cannot be impeached, or its validity in-quired into, by one who has only a "naked possession,"

without any title inchoate, or complete, under the United States—Hunter v. Hemphill, 6 Mo. 106; Sarpy v. Papin, 7 Mo. 505; Macklot v. Dubreuil, 9 Mo. 490; 11 Mo. 125; 12 Mo. 155; 13 Mo. 611; 36 Mo. 506; 6 Pet. 728; 9 Mo. 85 & 91; 20 Mo. 110; Bagnell v. Broderick, 13 Pet.

II. Chouteau has no title, equitable or legal, to the premises in dispute, and therefore is not in a condition to set up any objection to the patent to McRee.

1. The deed of Ruddell to Dameron was held to be void by this court in Holme v. Strautman, 35 Mo. 293.

2. The deed of Ruddell to Gillespie is inoperative, for the same reasons that destroy the deed to Dameron.

3. The deed of Ruddell to Tanner and Gillespie was acknowledged before a justice of the peace for Larran (or Lawrence) county, and which is defective, as the land was in New Madrid county, and the justice of the peace had no authority to take the acknowledgment.

4. The deed of Hertzog to Wash required him to sell the premises "at public sale, on giving ten days' public notice," while his deed to Chouteau was made privately, and without any notice.

5. The proceedings in Hertzog v. Hempstead, guardian of Wilt, were void, as Wilt's heirs were not made parties to the same.

6. The deed of Samuel McRee and wife to Pierre Chouteau, Jr., was a quit-claim. They had no title whatever when this deed was executed. It was made without any consideration, (see testimony of Mrs. McRee,) and any title acquired afterwards would not enure to Chouteau.

The title of the McRees was derived under the deed of Henry Clay and wife to them, dated October 11, 1839, while the deed of Samuel McRee and wife to Chouteau was made on the 30th August, 1838, more than a year before the title was vested in any of the McRees.

The operative words of this deed are, "bargain, sell, release, quit-claim and convey."

In Frost v. Raymond, 2 Cain. 190, it was held, that the

words "grant, bargin, sell, alien and confirm," in a conveyance in fee, did not imply a covenant or warranty of any kind at common law, and this decision has been adopted by all the standard writers—4 Kent, 191 ; Rawle on Cov. for Title, 471 ; 2 Hill. on Real Prop. 365.

The use of the word " quit-claim " defines the character of this deed, and restricts it to a mere quit-claim deed. Its insertion proves that the grantors intended to convey only such title as they then had—Bogy v. Shoab, 13 Mo. 380, and authorities cited in Mr. Hill's brief in that case; Vallé v. Fleming, 18 Mo. 489 ; Fink v. Darst, 14 Ills. 305 ; 19 Vt. 275.

7. The proceedings in McRee v. Hempstead, Wilt, and others, in 1848, to cure the defects in the proceedings in Hertzog v. Wilt, were not intended to benefit Mr. Chouteau. They were not instituted by him, and did not enure to his benefit, being long after the deed of McRee to him.

8. If it be true that this New Madrid location was void for any of the reasons mentioned by the appellant, then he has shown that he has no title, legal or equitable, to the premises, and that he is a trespasser.

III. The act of 26th April, 1822, does not apply to the New Madrid location on which the patent to Mrs. McRee was granted.

1. The construction which the appellant prays the court to give to this act, is flatly opposed to the decisions both of this court and of the Supreme Court of the United States. The same point was presented to this court in Cabanné v. Lindell, 13 Mo. 184 ; 2 How. 318 ; 8 Mo. 96 ; 21 How. 431 ; 22 How. 160 ; 6 Pet. 733.

2. The President had authority to grant the patent in the form in which it was issued—that is, not to O. Carroll, or his representatives, but to Mrs. McRee. Patents have been often issued in both forms. The form here adopted was sanctioned by the Supreme Court in Bagnell v. Broderick, where a patent precisely similar was held valid and effectual, and a recovery had upon the same.

IV. The patent passed the *legal* title to Mrs. McRee, and must prevail at law, even if the appellant should be considered as the owner of the inchoate title—Bagnell v. Broderick, 13 Pet. 184. In this case the patentee recovered in ejectment, although the defendant held his own deed for the land prior to the issuing of the patent.

The Land Department at Washington and the Secretary of the Interior have a general authority in passing the title to public land, and may annul surveys, warrants, &c., and order new ones to issue, and may, in general, exercise full control over all local officers—Maguire v. Tyler, 1 Black, (U. S.) S. C. 202.

V. The plaintiff is not estopped or barred by the deed of Samuel McRee and wife to Pierre Chouteau, Jr.

1. The deed is a mere quit-claim. It does not "purport to convey the same in fee simple *absolute*." Mrs. McRee joins simply and only for the purpose of relinquishing her dower. She had no pretence of title or claim other than dower. She would not be bound in any covenants in the deed—R. C. 1835, p. 122, § 25. Samuel McRee had no title when the deed was made, and no after acquired title in him would pass to Chouteau—Bogy v. Shoab et al. 13, Mo. 380.

2. The appellant has not shown that Mrs. Mary McRee derived or obtained any title to the premises under the will of her husband. On the contrary, the plaintiff has proven that she bought up the title from the heirs of George Ruddell with money advanced to her by the plaintiff for that purpose; and it was on the strength of the title thus obtained that the patent issued. These deeds were not given in evidence, because the plaintiff was not bound to go behind the patent, and it would have been improper practice to have done so.

3. The action of the Executive Department that Mary McRee was entitled to the patent is conclusive, and cannot now be inquired into by any tribunal. It (the Department) had the right to take proof as to the ownership of the land, and in doing so to determine who was the owner, and its decis-

ion is in the nature of a judgment of a court of law—Bagnell v. Broderick, 13 Pet. 184; Phil. & Tren. R.R. Co. v. Stimpson, 14 Pet. 448–58; Murray v. Hoboken Land Co., 18 How. 284.

This deed from McRee and wife to Chouteau "contains no covenants for title to the property conveyed. It carefully avoids the use of words which, under our statute, make certain words covenant for title." It was, then, nothing but a deed of release or quit-claim of the title then in McRee—Vallé v. Fleming, 18 Mo. 489; Fink v. Darst, 14 Ills. 305; 19 Vt. 276.

A deed in which the grantor granted, bargained, sold and quit-claimed the land, is a mere quit-claim, unless it contains some covenants of warranty, and works no estoppel— 14 Johns. 192; 5 Ala. 413; 1 Cow. 613; 9 Cow. 13. See authorities above cited.

HOLMES, Judge, delivered the opinion of the court.

It appears that James Y. O'Carroll was the original confirmee of a tract of six hundred and forty arpents of land situated in the county of New Madrid as a settlement right confirmed under the acts of Congress. In 1805 he conveyed the land confirmed to George Ruddell, who continued to be the owner until after the passage of the act of Congress for the relief of the sufferers by earthquakes in New Madrid. In 1816, Ruddell and wife conveyed to James Tanner and Andrew P. Gillespie a tract of 550 arpents of land situate in the town of Little Prairie, county of New Madrid, lying on the waters of the Mississippi, and further described as a part of the land originally confirmed to James Y. O'Carroll (reference being had to the records of the record office of land claims in the Missouri Territory), which had been materially injured by earthquakes, reciting the act of Congress for the relief of the sufferers and the privilege given of locating other lands in lieu of the injured land, and purporting to convey all the privileges and benefits given to the said George Ruddell by the said act of Congress; and by deed of

the 17th of October, 1816, Andrew P. Gillespie conveyed to James Tanner "all his right, title and claim of James Y. O'Carroll." There were some other deeds from the same parties to Tanner, which it is not deemed necessary particularly to notice.

These deeds were given in evidence by the defendants. The objections of the plaintiff were immaterial so far as the reasons of them are stated in the record. The defendants of course cannot raise any objection to their admissibility as evidence. That a deed was not recorded within one year made it void only as against subsequent purchasers and mortgagers from the same grant or for a valuable consideration. It was still good and valid against the grantor and his heirs, and was effectual to pass the title as between the parties—1 Ter. Laws of Mo. 46, § 8; McCamant v. Patterson et al., 39 Mo. 100. These deeds were sufficient in law to pass the title to the injured land to James Tanner, with the right to locate other lands in lieu thereof; they were not void on their face for uncertainty of description. The description given was capable of being made certain by extrinsic evidence ; no objection appears to have been made to them on this ground. Under the Spanish law prevailing here before the introduction of the common law, in 1816, land might have been transferred by parol and mere delivery of possession; and in Mitchell v. Parker, 10 Mo. 260, it was held that an instrument made after the passage of the act of Congress of the 17th of February, 1815, which merely gave a power coupled with an interest, was at that time effectual as an actual conveyance to enable the grantee to convey the land in his own name. These deeds not only gave a power coupled with an interest, but expressly conveyed the land. We think they were sufficient to make James Tanner the legal representative of O'Carroll and Ruddell in respect of the injured land.

It further appears that a certificate of location (No. 150) was issued by the Recorder in the name of James Y. O'Carroll or his legal representatives, dated November 30, 1815,

for 640 acres of land, and delivered to James Tanner to be located in lieu of the injured land, which was then relinquished by him to the United States. This certificate was located by Christian Wilt, to whom Tanner had conveyed the injured land with full power and authority to locate the same for James Y. O'Carroll or his legal representatives; and notice of the location was given to the Surveyor General, and a survey and plat were made in 1818, and returned to the Recorder as survey No. 2498 for 640 acres of land, in the same name, and a patent certificate (No. 447) was issued thereon by the Recorder on the 16th of August, 1841. Thus a complete location had been made. No certified copy of this location from the office of the Recorder appears in this record; but it does appear from the evidence that a transcript plat of this survey and location had been returned to the Recorder and that a patent certificate had been issued on that day. And it further appears that on the 26th of March, 1862, the Surveyor General then in office ordered said transcript plat of survey to be set aside and annulled, for the reason that it was " erroneous in omitting to show the interferences of other surveys with the same," and as being in contravention of the instruction of the Commissioner of the General Land Office," and as " superseded by the correct plat of said survey returned to said Recorder by him on the 26th of May, 1862," on which a new patent certificate and a patent to Mary McRee, assignee of James Y. O'Carroll, had been issued; and it appeared, also, that in December, 1862, the Recorder ordered the patent certificate No. 447, issued on the 16th of August, 1841, to be set aside and annulled, as being in contravention of the directions of the Commissioner and as having been erroneously issued. These orders appear to have been made under instructions from the Commissioner, which were approved by the Secretary of the Interior in 1862, on the application of this plaintiff. Upon this new transcript plat being returned to the Recorder, a new patent certificate was issued by him in the name of Jas. Y. O'Carroll or his legal representatives, and upon this cer-

tificate a patent dated the 10th of June, 1862, was issued under the seal of the General Land Office for the located land to Mary McRee, reciting the certificate of location (No. 150) and the survey and location made for James Y. O'Carroll or his legal representatives, and that the right of said O'Carroll through intermediate assignments had been transferred to her, and the land described was therefore granted to her as his assignee, in virtue of deraignment of title, and to her heirs; and Mary McRee conveys the land in dispute to the plaintiff.

The act of Congress of the 26th of April, 1822, required that thereafter the holders and locators of these certificates of location or warrants should be bound in locating them to conform to the sectional lines of the public surveys, and declared that all warrants should be located within one year after the passage of the act, in default whereof they were to be null and void. This certificate or warrant had been located before the passage of this act, so far as the holder had anything to do with the location. The warrant had been located and the land surveyed according to sectional lines. All the requirements of this act had been complied with. According to repeated decisions of the Supreme Court of the United States, the location was not complete, so as to operate a change of title, until the survey and plat of location had been returned to the Recorder and recorded and approved by him, and that then only the injured lands reverted to the United States, and the inchoate equitable title to the located land became vested in the locating owner of the injured lands—Bagnell v. Broderick, 13 Pet. 436; Barry v. Gamble, 3 How. (U. S.) 51; Lessieur v. Price, 12 How. (U. S.) 60. All these things had been done in this case, so that the location had become complete.

The act of 1822 applied only to the holders of warrants or certificates and to acts to be done by them. The officers of the Government are not mentioned in this section of the act, and there would appear to be no rational ground on which it can be maintained that this provision as to the limit of

time was intended to apply to acts and things which were to be done by the Surveyor and Recorder after the location was made and surveyed. This point was expressly decided in the case of Cabanné v. Lindell, 12 Mo. 184. The case of Barry v. Gamble, 3 How. (U. S.) 52, impliedly recognizes the same doctrine, and it was said that after that act "no location of a New Madrid claim should be permitted that did not conform to the sectional and quarter-sectional lines"; and the second section declares that "if not so located within one year the warrant shall be void, and no location shall ever afterwards be made under it." The decision in Easton v. Salisbury, 21 How. (U. S.) 426, was placed on the ground that the lands had been reserved from sale, and were not subject to location at all ; and it was also said that all warrants not located within one year from the date of that act "are null and void."

The location and survey had been made in 1818, and a patent had been issued in 1827, and the certificate and patent were held to be void because the land was reserved and not subject to location; but it is at least not clear that the court meant to hold that a location actually surveyed on lands not reserved from sale, and in conformity with law, within the time limited by the act, would be null and void merely because the transcript plat had not been returned to the Recorder and recorded by him within that time. And in Hale v. Gaines, 22 How. (U. S.) 144, the application of the holder of a certificate, issued in 1818, for a location and survey, was disregarded by the Surveyor General because the lands asked for were as yet unsurveyed, and it was not located until 1838 ; but it was said that this might have been done after the public land had been surveyed into sections, and within the time limited by the act. We are of opinion that this survey and location were not void merely because the survey and plat had not been returned to the Recorder within one year after the passage of that act.

With regard to these ministerial and executive duties where no absolute limit of time, place or manner is put upon

the power to perform them, it may be proper to say in general that the sooner they are done the better, and the longer they are delayed the greater is the reason why they should be done as soon as practicable. But it seems the Surveyor General and Recorder, under the instructions from the Commissioner, undertook in 1862 to set aside and annul the survey, location and patent certificate, when the location had been completely made in 1841. The only reason which appears on this record for this action of these officers is that the plat of the first survey did not show the "interferences of other surveys with the same," and that it was therefore, as we are left to infer, "in contravention of the instructions of the Commissioner." But whether or not these instructions existed when the survey was made and returned, we are left to conjecture. This would seem to be a very insufficient reason for such an act, even if these officers had the power to do it. The interferences were no part of the survey of this land. It is the province of the courts to determine judicially between conflicting titles to the same land. Surveys are merely evidence of location and boundary; they decide nothing as to the validity or superiority of the title. The area embraced within the interferences of surveys will go with the better title. The marking of the interferences on the plats of survey may be a matter of convenience for all parties concerned, and it is doubtless a proper regulation of the Land Office, but it is no essential part of a survey.

It is a great error to suppose that two surveys may not be correctly made to cover the same land—McGill v. Somers, 15 Mo. 80. No survey could be lawfully declared null and void merely because it did not show the interferences of the surveys. Such a power would enable the Surveyor and Commissioner to declare all the surveys and locations void that have ever been made, on ground as futile as that the point of compass was marked on the plat with a straight line, and not with an ornamental arrow-head.

We are of opinion that these orders setting aside and annulling this survey, location and patent certificate were

without authority of law, and utterly null and void.  Where an individual in the prosecution of a right does everything which the law requires him to do, the law will protect him against the misconduct or neglect or unauthorized acts of a public officer—Lyttle v. Arkansas, 9 How. (U. S.) 333.  At the same time all the difference there appears to be between the first plat and patent certificate, and the second, consists in the fact that the interferences of other surveys are duly marked and indicated in the second set of documents.  As a survey, location and patent certificate for this land, the new documents are all the same thing as the former, and the new patent certificate ran in the name of James Y. O'Carroll, or his legal representatives, like the first one.  It does not appear to be material, therefore, which set of documents is to be considered as the valid one, so far as the authority of law for the issuing of a patent thereon was concerned.  There was a valid location made; a good and valid patent certificate had been issued thereon, and the patent was therefore issued by authority of law.

The patent was issued directly to Mary McRee, as the assignee, by virtue of deraignment of title, and not to James Y. O'Carroll or his legal representatives.  It assumes to have ascertained the person who was the assignee and legal representative.  The power and authority of the President to issue the patent to this person, if truly ascertained, can scarcely be doubted.  If it had been issued in the name of the original confirmee, or his legal representatives, it would have been left to the courts to ascertain upon judicial investigation who was the person to whom the patent had passed the title.  That may still be the subject of judicial inquiry; and a court of equity, if it were ascertained to have been granted to the wrong person, could afford the proper relief to the right person.  The act of Congress evidently contemplated that the owner of the injured land would make the location and receive the patent.  It was necessarily to be issued and delivered to some person.  The original grantee of the injured land was long since dead.  To whom should

it be given but to the legal representative? If Mary McRee were, in fact, that person, then the patent conveys the land to the right owner of the equitable title. How, then, can it be declared void on its face? In such case it would be issued without fraud and by authority of law. The recitals are certainly binding and conclusive upon the grantor. These recitals make it appear on the face of the patent that it was issued upon a New Madrid location and patent certificate, and, therefore, that it was issued by authority of the act of Congress. A patent may be void because the land had been previously reserved from sale—Jackson v. Clark, 1 Pet. 628; Linsey v. Miller, 6 Pet. 674; Easton v. Salisbury, 21 How. (U. S.) 426: or because the land had been granted to another—Lessieur v. Price, 12 How. (U. S.) 60: or because the land had already been appropriated by law to satisfy another claim and patent—Brown v. Clements, 3 How. (U. S.) 667: or because it was obtained by fraud, or was issued without authority of law—Stoddard v. Chambers, 2 How. (U. S.) 318. None of these things appeared on the face of the patent here.

No other fraud is suggested than what might consist in the issuing of the patent to Mary McRee by name, and not in the name of O'Carroll or his legal representatives, or to some other person as the legal representative; and if the recitals were true, there was certainly no fraud in that. And it may be considered as settled that when a patent of this kind is produced in evidence, we are bound to presume for all the purposes of this action that all previous steps have been taken by the grantee to entitle her to the patent, and that she had the superior right to obtain it; and having obtained it, she has the best title known to a court of law, until the contrary is made to appear—Bagnell v. Broderick, 13 Pet. 450; Hooper v. Scheimer, 23 How. (U. S.) 235.

The plaintiff rested on the patent, and there can be little doubt that it made for him a *prima facie* case. It was entirely competent for the defendants to show, if they could, that the patent was obtained by fraud, or was issued without

authority of law ; or that, being valid, it enured to their bene-
fit as the true legal representatives and owners of the equita-
ble title.   But they must show some title in themselves that
would give them a standing in court, and enable them to
call in question the validity or correctness of the document-
ary evidences of title emanating from the Government; and
they undertook to do this by showing that they were the true
owners of the inchoate equitable right, and that the patent
enured to vest the legal title in them.

The evidence showed that the equitable title to the located
land had become vested in the heir of Christian Wilt in 1841,
when the location was complete.   The title which the de-
fendants claim from the heir of Wilt through a decree in
chancery, and the deed of the general guardian, made in
pursuance thereof, to Joseph Hertzog, and through a deed
of trust given by Hertzog, must be held to have been wholly
ineffectual and void, for the reasons that the heir was not
made a party to the proceedings, and could not appear and
answer by his general guardian only* (Sto. Eq. Pl. § 44, §
58, n. 3, § 70 ; 1 Dan. Ch. Pr. 229, 563) ; that the trustee's
deed did not show that the sale had been made in pursuance
of the power given to sell ; and that these documents de-
scribed the located land, when the equitable title thereto
did not exist at the time nor until after the location was
completed in 1841.   The deed of Hertzog by the sheriff to
Henry Clay, executor of James Morrison, was ineffectual to
convey any title for like reasons.   But afterwards, in 1844,
and after the complete location had been made and the equit-
able right had become vested beyond any question in the
heir of Wilt, a bill in chancery was filed by Samuel McRee
against the heirs and representatives of Christian Wilt and
Joseph Hertzog, praying that all their right and title to the
located land might be vested by decree in the plaintiff, and
such decree was accordingly made in 1848.   Samuel McRee
thereby became the owner of the inchoate equitable title to

* See R. C. 1835, p. 294, § 5.

the located land as the legal representative of O'Carroll, and by his will the same was passed to Mary McRee, his widow, in 1849.

The defendants rely upon the deed of Samuel McRee and wife, dated the 30th August, 1838, and insist that the after acquired equitable title to this location enured to the grantee in that deed, and those holding under him by way of estoppel, or as being a deed which purported to convey the land "in fee simple absolute," under the statutes of this State then in force (Act of 1835, § 3,); and still further, that the patent itself enured to their benefit and vested the legal benefit in them.

If this deed purports *to convey the real estate in fee simple absolute*, the after acquired title passes under the statute, otherwise not. There is no covenant of warranty, and no estoppel by virtue of any kind of expressed warranty. The words "bargain, sell, release, quit-claim, and convey," are words of release and quit-claim merely. They carry the grantor's interest and estate in the land described, whatever it may be; they do not of themselves purport to do anything more; they do not even raise the statute covenants implied in the words "*grant, bargain and sell*," nor would these covenants operate as the ancient common-law warranty to transmit a subsequently acquired title—Chauvin v. Wagner, 18 Mo. 488. There is no English authority that any other conveyance than a feoffment, fine or lease operated by way of estoppel to pass an after acquired title—Rawle on Cov., 3d ed., 408. The land is described as being a part of the tract located under a New Madrid certificate, issued to James Y. O'Carroll, or his legal representatives, and as being the same .parcel of land conveyed to Pierre Chouteau, Jr., by Robert Wash as trustee of Joseph Hertzog by deed recorded. The *habendum* is to Pierre Chouteau, Jr., and his heirs forever. This description would seem to show very clearly that neither party contemplated any other than the inchoate title created by a location under a New Madrid certificate, whatever that might be, and not a fee simple; and that the

grantee already had, or claimed to have, that inchoate right by virtue of a deed from Hertzog's trustee, and the grantor releases, quit-claims and conveys all his interest in the same land and title for the small consideration expressed. It is essentially a quit-claim deed and nothing more. It makes no positive averment that the grantor is seized or possessed of any particular estate in the premises which the deed undertakes to convey and confirm. Such averments, to create an estoppel, must be positive and certain. Where the truth appears by the same instrument that the grantor had nothing to grant, or only a possibility, there is no estoppel—Raw. on Cov., 3d ed., 404, n. 2. No seizin or possession of any particular estate is affirmed in the deed, either in express terms, or by necessary implication, whereby an estoppel might be created. In Van Rensalaer v. Kearney, 11 How. (U. S.) 297, the deed expressly affirmed that the grantor had seizin and possession of the estate conveyed, and undertook to convey and confirm the same to the grantee. This is not a deed of that character. It falls within the general principle, which is fully recognized in that case, that a deed of this character, which purports to convey, and is understood to convey, nothing more than the interest or estate of which the grantor is seized or possessed at the time, does not operate to pass or bind an interest not then in existence. In French v. Spencer, 21 How. (U. S.) 228, also, the deed expressly affirmed the existence of the particular interest and estate conveyed, and empowered the grantee to make the location and receive the patent for the land when that interest should be ripened into a complete title. This is clearly not such a deed; nor does it purport to convey *a fee simple absolute*. To have this effect under the statute, the deed must undertake to convey an indefeasible title. It must not be a quit-claim deed merely, transferring the grantor's interest, whatever it may be, but a deed which expressly undertakes to convey the land itself, and to convey it in such manner that the grantee is not to be disturbed in his possession by

any one—Bogy v. Shoab, 13 Mo. 365. It must contain such positive and certain averments of an absolute title in fee simple as would amount to an express warranty, if contained in a covenant of warranty, that the grantor was seized and possessed of such title and estate, which he undertook to convey, assure and confirm to the grantee against all the world, and would therefore create an estoppel by virtue of which the subsequently acquired title might enure to the grantee.

The statute provision would seem to be the same in principle as the doctrine laid down in these decisions of the Supreme Court of the United States proceeding upon the idea of an estoppel. It is said in Bogy v. Shoab that the statute extends to every deed which was obviously intended to convey, and. purported to convey, a fee simple absolute even without a covenant of warranty; but that it did not reach, and ought not to apply to, a deed where the grantor expressly guards against such an inference by inserting a special warranty against himself only and those claiming under him. The statute requires that the deed should undertake to convey a fee simple absolute. The decisions go further and extend the same principle to a deed which expressly purports to convey some particular estate of which the grantor is seized or possessed, and which is affirmed in the deed with such certainty of averment as would be sufficient to bring the case within the operation of an estoppel—11 How. (U.S.) 325; Rawle. on Cov., 3d ed., 408–87.

A similar statute in Illinois has received the same construction which is given to it in this State—Frink v. Darst, 14 Ills. 304. In Cooke v. Brogan, 5 Ark. 693, under a like statute, the after acquired title was held to pass by deeds which conveyed the lots *in fee simple*. This deed can have no greater force than a mere quit-claim which expressly conveys only " the right, title and interest " of the grantor, as the case was in Vallé v. Fleming, 18 Mo. 486. We conclude, therefore, that the after acquired inchoate equitable title to this location did not pass and enure to the grantee

under this deed, and that neither the grantee nor these defendants thereby became the legal representatives of O'Carroll, Ruddell and Wilt in respect of this land.

It is insisted further that the patent enured to the grantee under this deed, and to those claiming under him, by virtue of the doctrine of relation and *ex post facto* operation, whereby the patent is made to relate back to the inception of the title and to enure to the owner of the inchoate equitable right — French v. Spencer, 21 How. (U. S.) 228; Ross v. Borland, 1 Pet. 664; Landes v. Brant, 10 How. (U. S.) 348. The equitable title under the act of Congress to the located land had its inception when the location was made, if not before. The evidence shows that this inchoate equitable title had been transferred through intermediate conveyances to Mary McRee, and under the operation of this doctrine of relation the patent enured to her as the assignee and legal representative of James Y. O'Carroll, and would have enured to her in like manner even if the patent had been issued in the name of O'Carroll, or his legal representatives. The inceptive title and the absolute legal title were thus united in her. It follows that the defendants, on the evidence, had not even the equitable title which would support the action of ejectment under the statutes of this State. They were reduced to the naked possession, without the shadow of a title, and must therefore be considered, both in reference to the documentary evidences of title issued by authority of the United States and in reference to the statute of limitations, as mere intruders. Until the patent issued the legal title remained in the United States, and the statute of limitations did not begin to run against the plaintiff before the date of the patent. If the defendants had shown themselves to be the owners of the equitable title, as against the plaintiff standing on his legal title by patent, the right to the possession thus shown by virtue of the equitable title only would have been inferior to the right of possession by virtue of the absolute legal title, and the plaintiff would still have been

entitled to recover in this action but for the operation of the doctrine of relation and direct enurement of the patent to their benefit as the owners of the inceptive right, and but for the effect of the statutes of this State—Fenn v. Holme, 21 How. (U. S.) 481 ; Hooper v. Scheimer, 23 How. (U. S.) 235 ; French v. Spencer, 21 How. (U. S.) 228 ; R. C. 1855, p. 692, §§ 11 & 12.

It has uniformly been held in this State, that a mere intruder without title was not in a position that would enable him to call in question or dispute the correctness or validity of documentary evidence of title issued by authority of the United States in pursuance of the acts of Congress. They are binding on the Government while they subsist in force, and no mere stranger or intruder can be allowed to complain—McGill v. Somers, 15 Mo. 80 ; Robbins v. Echler, 36 Mo. 494.

It was argued that this location and patent were void, for the reason that the land is situated within the Spanish commune or town of St. Louis, which was completely disposed of under the act of Congress of the 13th of June, 1812, and within the outboundary line required by that act to be run so as to include the whole granted and reserved premises, and that this land was therefore reserved from sale. There is no evidence in this record on which we can undertake to decide that this land was so reserved from sale. It is very possible that such outboundary line might, or might not, be so run as to include this land ; but until an official survey of such outboundary, including this land, is produced, the contrary will be presumed. The case of Glasgow. v. Hortiz, 1 Black. (U. S.) 595, has no bearing upon this question.

We have come to the conclusion that there was no error in the instruction which was given for the plaintiff ; that being so, it necessarily follows that any error committed in the refusal of the defendants' instructions must be immaterial ; they will not, therefore, be particularly examined.

The judgment will be affirmed. The other judges concur.

The defendants filed their motion for rehearing as follows :

### Motion for Rehearing.

The defendant in this cause now comes and moves the court to grant a rehearing herein, and in doing so he does not propose to ask the court to review any of the questions which in the opinion given in this cause have been examined, but upon one upon which the court have pronounced no opinion, and the determination of which affects not only the land in controversy, but necessarily involves the very grave question whether—in the case of confirmations under different acts of Congress, which acts provide for the issuing of a a patent — the statute of limitations does not commence running until the patent actually emanates from the United States.   There are many lots of ground in the city and its vicinity confirmed under various acts of Congress, where no patent has ever issued ; and yet where actions of ejectment have been under our statute maintained, and the statute of limitations as a defence has been set up and admitted to be a good defence, we apprehend that it is certain that this judgment cannot be allowed to stand without directly reversing the cases of Cabanné v. Lindell, 12 Mo. 184, and that of Givens v. Gray, 26 Mo. 300, both decided by the Supreme Court of the State, and commencing as far back as the year 1848, as well as the cases of Bagnell v. Broderick, 13 Pet. 436 ; Barry v. Gamble, 3 How. 51 ; Lessieur v. Price, 12 How. 74, which cases in the United States Court conclusively hold that the right to the new located land passed by operation of law when the survey of newly located land was filed in the office of the Recorder of land titles, and that at the same time the title to the injured land passed to the United States, thus effecting, as the court have said, an exchange of land between the two proprietors — the United States on the one hand, and James Y. O'Carroll's legal representatives on the other.   The question becomes the more grave, because by the decision in this case no notice has been taken of it, and it will be said in the Supreme Court of the United States that the Supreme Court of the State has virtually if not directly overruled the cases of Cabanné v. Lindell and Gray v. Givens ; and that as this was a decision of the highest court of the State upon a local statute, that decision is conclusive upon the Courts of the United States.

Again, in order to give the Supreme Court of the United States jurisdiction, the decision must be against the validity of some act of Congress, &c.

I. The action of ejectment would lie, under our statute, (tit. Ejectment) on a New Madrid location. By all the authorities, State and Federal, the location became perfect on the return of the survey to the Recorder of land titles— See cases above cited.

II. In the decision filed in this case it is held that the return of the survey in 1841 to the Recorder was operative, and that the proceedings subsequent, to annul the patent certificate of 1841, were simply void—See opinion.

The exchange of the new location for the lands injured by earthquakes was effected in 1841. Mr. Chouteau was then in possession of the *locus in quo* by color of title, by recorded deeds ; and whosoever held the title, right or claim to the new location in 1841, Mr. Chouteau held adversely to him by substantial enclosures and houses. From that day, in 1841, to the day this suit was commenced in 1862, the defendant continued in possession, a period of 20 years, open, notorious and adverse—Gray v. Givens, 26 Mo. 300, approving Lindell v. Cabanné, 12 Mo. 184 ; Biddle v. Mellon, 13 Mo. — ; and basing the decision on the case of Bagnell v. Broderick, 13 Pet. 436 ; Barry v. Gamble, 3 How. 51, and Leisseur v. Price, 12 How. 60.

The constitutional question is fully considered, and the right of the State to pass laws for the limitations of actions of ejectment in such cases is distinctly affirmed. Altogether the cases of Gray v. Givens and Cabanné v. Lindell cannot stand if the case at bar be held not to furnish a defence under the statute of limitations. Gray v. Givens, 26 Mo. 300, expressly decides that in this case the statute is a complete defence.

III. The logical conclusion to be drawn from the cases is that the new location being perfected in 1841, the exchange by operation of law was concluded between the United States and the legal representatives of Jas. Y. O'Carroll, and the United States had no further interest, and the issue of the patent in 1862 was a mere form, and it related back to the day of the exchange in 1841, and passed the title to the legal representatives of Jas. Y. O'Carroll as of that day. See Landes v. Brant, 10 How., where the Supreme Court of the United States held that a patent issued to J. Clamorgan

in 1845, related back to the inception of the proceedings in 1806, and passed the title as of that date.

IV. The equitable title or claim would under our statute pass by limitations as perfectly as the legal estate. Whatever equity McRee had in 1838, when he made the deed to Chouteau for a part of the certificate, to-wit, 64 acres, passed by the deed, and McRee had the same equity then that he had in 1846, when the decree was entered. Mr. Chouteau's possession under that deed, for twenty years adjoining the said McRee and his devisee, operates (as under the case of Biddle v. Mellon, 13 Mo.) to give Mr. Chouteau a title to everything that McRee might have conveyed. If McRee had an equity, it passed—if he or any one else had a legal estate, it passed—by force of the possession for twenty years.

We sincerely hope that a rehearing in this case may be ordered, so as to give us an opportunity of considering the questions at issue, which are of such magnitude as to demand a most thorough and exhausting examination.

HOLMES, Judge, delivered the opinion of the court.

A motion for a rehearing has been filed in this cause, upon the subject of the statute of limitations, which, it is supposed, had not received a full consideration in the opinion that has been delivered. This subject was by no means entirely overlooked in making up our decision of the case; but our attention was not so particularly directed to the question of the operation of the statute of limitations as to other points which were more fully dwelt upon in the argument. It had certainly escaped our notice that in the case of Gray v. Givens, 26 Mo. 291, the plaintiff had given in evidence not only the documentary evidences of a New Madrid location made, but also a patent dated in 1855, and that the court distinctly held that an adverse possession for the full period of the statute of limitations constituted a bar as against both the location and the patent. As to what weight is to be given to this precedent, or to the reasons and authorities on which it rests, as against the later decision of the Supreme Court of the United States in Fenn v. Holme, 21 How. (U. S.) 481, we shall not now express any opinion, further than to call the attention of counsel to the subject.

37—VOL. XXXIX.

It has occurred to us, also, that it may be a matter deserving further argument, whether, when the equitable title, acquired by virtue of a complete location made, has passed out of the United States, an adverse possession for the full period of the statute of limitations, which may be deemed equivalent to an absolute title as against all but the sovereign proprietor of the soil, may not be held to be conclusive evidence of an actual conveyance of such equitable title to the adverse possessor, so that the patent may be made to enure to him as the owner of the inceptive right.

We have been led to entertain serious doubts, also, whether such absolute title by adverse possession, under the statute of a State, can possibly be made to prevail against a party claiming by patent from the United States within ten years before suit, as if it were a title superior to that of the sovereign.

For these reasons, and considering the great importance of a correct settlement of this question in this State, as well as the magnitude of the interests involved in this particular case, we have concluded that it would not be inconsistent with our duty in the premises to grant this motion for a rehearing on this subject of the statute of limitations, and also upon the effect of the first decree in chancery to pass the title of the heir of Christian Wilt, on which there may be some room for doubt.

The judgmemt of affirmance will be set aside, and the cause will be set down for a rehearing on this point on the first day of next term; the other judges concurring.

---

### Brief of B. A. Hill, on Rehearing.

I. The statute of limitations began to run from the day the survey of the New Madrid location was returned to the Recorder of land titles, and the patent certificate was issued August 16, 1841.

(*a*) The patent certificate in this case has the same effect as the patent certificate issued under a confirmation by the old Board under the acts of 1805 and 1807 ; the same identical form is adopted, that " the party is entitled to a patent for the tract of land therein designated." The list of patent certificates shows this date, and an extract from that list appears in the part of the record appended to the printed record by stipulation—Gray v. Givens, 26 Mo. 299.

In Bagnell v. Broderick, 13. Pet. 448, and Barry v. Gamble, 3 How. 51, the Supreme Court of the United States held that the land was appropriated and severed from the public domain to satisfy the grant by the New Madrid act, when the plat and survey were returned by the Surveyor General to the Recorder of land titles—Lessieur v. Price, 12 How. 74 ; Cabanné v. Lindell, 12 Mo. 184. This has been a rule of property in this State from that day.

II. The exchange between James Y. O'Carroll and the United States was effected on the 16th August, 1841, when the patent certificate was ordered to be issued, and the proceedings to obtain the patent were a mere form. The patent issued on the 10th of June, 1862, to James Y. O'Carroll, or his legal representatives, whereby the title under the great seal passed in form for the located land to James Y. O'Carroll or his legal representatives.

III. By the doctrine of relation, the land located by a survey was exchanged in 1841 for the land injured by earthquakes ; and when the patent issued in 1862, it related to the day when by force of the acts of Congress the exchange had been effected.

In Landes v. Brant, 10 How. 372, it is held that a patent issued in 1845, a few days before suit was brought on a confirmation of 1810, the patent related back to the day of the filing of the claim in 1806 before the Recorder for confirmation. An instruction (pp. 358-9) giving the defendant the benefit of the statute of limitations was not held to be erroneous. The title of Clamorgan, in the case of Landes v. Brant, under the confirmation, was held to be inchoate or

inceptive, and the patent was held to carry the legal title back by relation to the day of the filing the claim for confirmation, and to vest the legal title as of that day.

In Gray v. Givens, 26 Mo. 300-1, the Supreme Court of this State, following the decisions of the Supreme Court of the United States of 1837 and 1843, and of the Supreme Court of Missouri of 1848, holds that the statute of limitations runs from the day of the exchange by force of the acts of Congress, the day of the issuing of the patent certificate on the New Madrid location.

The logical conclusion to be drawn from all the cases is, that the New Madrid location being perfected in August, 1841, the exchange was finally made between the United States and the legal representatives of James Y. O'Carroll, and the United States had no further interest or title in the land, and the issue of the patent in 1862 was a mere form, and the patent consummating the exchange, as the final record of the Government, related back like an execution to the day of the attachment, and passed the title according to the act of Congress as of the day when the exchange was effected in 1841.

IV. The equitable title or claim would under our statute pass by limitations as completely as the legal title—McNair v. Lot, 34 Mo. 285. Whatever equity McRee had in 1838, when he made the deed to P. Chouteau for the 64 acres described in his deed, he had in 1846, when his new decree was entered affirming the old decree of 1821.

In Fenn v. Holme, 21 How., the Supreme Court of the United States only held that the courts of the United States had no jurisdiction at law of inchoate or equitable titles.

In Maguire v. Tyler, 1 Black, 199, 202, the court held and exercised jurisdiction over an equitable title originating under a confirmation of 1810, as against an United States patent issued for the same land in 1852 to Louis Labeaume. This case expressly holds that the Federal courts will take jurisdiction over equitable titles emanating under acts of Congress.

The inchoate claim to an unlocated tract of land is cer-tainly not so clear as a claim upon an exchange under acts of of Congress after a survey locating the land by the United States, and granted by the United States to Jas. Y. O'Carroll or his legal representatives.   In the case of Mitchell v. Hand-field, 33 Mo. 438, the court held that a confirmation on a Spanish survey for Labeaume passes the title to the land in-cluded in the survey, and that the title passes at the time of the confirmation.   So it was held in West v. Cochrane, 17 How. 412–13, 417.

V.  The title passes in 1841, in this case, by force of the act of Congress of 1815.

We do not question the right of Congress to pass the title to the lands of the United States ; but as to the title they vested, we hold that the courts of this State have the right to decide.    When the title has passed, the forum is here, and the courts of this State can adjudicate upon them.

*Glover & Shepley*, for appellants.

The possession for more than twenty years since the sur-vey was returned in 1841 to the Recorder of land titles, and before the commencement of this suit, is an effectual bar to the plaintiff's right to recover.

Graver consequences can scarcely arise in the determina-tion of questions affecting real estate in this State than will arise if the court shall hold decisively that the statute does not commence to run until the emanation of a patent in the case of a New Madrid location.    In this county, until the last two or three years, the great majority of New Madrid locations were without a patent ; while in the counties on the Missouri river there were and are now very few upon which patents have issued.    So as to confirmations by the first Board of Commissioners which require patents, but on which in the great majority of instances patents have never issued ; the same principle that would prevent the statute from running in the case of a New Madrid location until a patent issued would equally apply to such cases.

1. The title as between the United States and the owner of the New Madrid certificate became vested in the holder of the New Madrid certificate at the time of the filing of the survey of the land located thereunder in the office of the Recorder of land titles—Bagnell v. Broderick, 13 Pet. 448 ; Barry v. Gamble, 3 How. 51 ; Givens v. Gray, 26 Mo. 300. So afterward in the decision given in this case.

2. Since 1825 ejectment would lie in the State courts in favor of a plaintiff claiming under a New Marid location, the survey of which had been so returned—Acts of 1825, pp. 234-5.

The Supreme Court of the United States recognizes the validity of the laws of Missouri giving owners of imperfect titles the right to sue in ejectment.

3. The survey having been returned in 1841, and Chouteau having taken possession prior to that time of this land under a recorded deed, and having had possession ever since under it down to the commencement of this suit in 1862 adverse to plaintiff and those under whom he claims, the action of plaintiff is barred—Lindell v. Cabanné, 12 Mo. 184 ; Givens v. Gray, 26 Mo. 300 ; Clemens v. Runckel, 34 Mo. 41. In this last case, all the objections which the plaintiff urges against the bar of the statute are considered and overruled.

Even if he (Chouteau) had not claimed under recorded deeds, but held alone under actual possession, yet under the decisions in this State that possession, when for the length of the time mentioned in the statute, gives title of itself upon which an ejectment can be maintained—Biddle v. Mellon, 13 Mo.

The case of Givens v. Gray is admitted to be decisive of this case, unless it be overruled ; and the plaintiff holds that the case of Fenn v. Holme, 20 How. 488, is entirely antagonistic to that decision, and overruled it. This does not in the least affect this question ; it is simply a question as to the form of action. That is, a claimant under a confirmation of the first Board of Commissioners, under the Recorder's decision under the act of 1816, or holding under a New Mad-

rid certificate surveyed and returned to the Recorder of land titles as the acts under which these respective titles emanated, provided for the issuing of a patent, until that conclusive evidence of title issue, the common law action of ejectment would not lie.

The radical defect in the plaintiff's argument is, that he denies that there is any vesting of title until the patent issues. No decision can be found that holds any such doctrine; on the contrary, all these decisions hold that the title passed out of the United States at the time the survey was returned. This is expressly asserted in all these cases. In the decision in Fenn v. Holmes, at p. 488, it is declared only that because "the patent is the *superior and conclusive evidence* of the legal title in the courts of the United States, the action of ejectment cannot be maintained without the patent."

*Gibson*, for himself.

As to the statute of limitations:

I. The opinion already given that the plaintiff's title was neither barred nor divested by the statutes of this State, being based upon the decisions in Fenn v. Holme and Hooper v. Scheimer, the first question that arises here is, whether the construction given to those decisions was erroneous; for if it be correct, all further inquiry is concluded, the Supreme Court of the United States being the ultimate authority on the question, and it having, in Fenn v. Holme, had under consideration the identical title set up here by the defendant.

1. Fenn v. Holme was not decided upon any question relating to the pleadings. It was not doubted that the pleadings were in proper form, and that if the plaintiff therein could maintain any action at law, the action brought was the correct one to bring; but the court held that no action at law could be maintained by the plaintiff in that case.

In Hooper v. Scheimer, the case of Fenn v. Holme was affirmed, and the court declared that "it is the settled doctrine of this court that no action of ejectment will lie on

such an equitable title, notwithstanding a State Legislature may have provided otherwise by statute. The law is only binding on the State courts, and has no force in the Circuit court of the Union." I admit that these decisions are in direct conflict with Gray v. Givens, 26 Mo. 300.

The case of Gray v. Givens cannot be sustained on legal principles, and conflicts directly with a series of decisions of the Supreme Court of the United States, of this State, and of other States. This case necessarily decides either that the fee emanated from the Government before the patent issued, or that the statute of the State ran against the fee while it was still in the Government.

As to the first point, the court seems to base its decision on the cases of Bagnell v. Broderick, Barry v. Gamble, and Lessieur v. Price, and to have concluded from the language used in those cases that the legal title had passed from the Government when the return of the survey was made to the Recorder. It says there is "title and a right of action." Fenn v. Holme and Hooper v. Scheimer exploded the construction thus given to these cases. In Barry v. Gamble, and Lessieur v. Price, the only question was, when the location become sufficiently formal and valid to operate as against conflicting claims held by third persons. No such question as herein involved was before the the court in either of those cases.

In Bagnell v. Broderick the patent prevailed against the inceptive title, although the defendant actually held the deed of the patentee for the land. After this decision, to hold that the title had passed before the patent issued was a simple blunder.

The laws of Congress, and the decisions of the Supreme Court of the United States, which declare that the fee shall pass only by the patent, were intended and desgined to secure uniformity in the disposition of the public domain, and to secure the land to the true owners under the Federal Government. The court says "there is title"; but what was the nature thereof? It certainly was not legal, and it is

a misnomer to call it an equitable title : it was an equitable interest.   By whatever name it may be called, it was simply a just demand or claim upon the Government for the land, which could not be enforced by a court of equity (Maguire v. Tyler, 1 Black), nor prosecuted at law (Fenn v. Holme).

It says there was a "right of action," but it does not say under what laws.   There was a right of action under the State laws, but none under the Federal laws.

It is the settled doctrine of this court that, in a contest between a patent and an entry, the patent will prevail—17 Mo. 31; 20 Mo. 108.

Now, when this location became complete on the return of the transcript plat of the survey to the Recorder, the title of Mrs. McRee was precisely the same as an entry.   In the case of an entry, the party buys the land with his money, and has an vested equity, but no title.   In the case of a New Madrid "complete location," the locator has bought the land in an exchange, and paid for it by conveying to the Government the injured land.   In either case the Government receives a valuable consideration.   If the statute runs against the locator, or operates to convey his equity, it will necessarily be equally efficacious against an entry.   Now, suppose A. has the senior entry and B. has the junior entry, a patent and possession.   If A. brings his action on his entry he must fail ; and, if he is delayed (as is often the case) for more than ten years, if the defendant is right, the statute runs against his title by patent, or operates to convey his equity, which brings the legal title by enurement to it, and, in either case, he loses the land.   When it is considered that the Legislature, once the power is admitted to be in it, may fix its own time within which the action must be brought, (in Wisconsin the time for non-residents is fixed at three years, and in Illinois in some cases at eighteen months), and that local political bodies are liable to be influenced by local interests, it will be seen, when this question is brought before the Supreme Court of the United States, it is not likely to receive a favorable consideration.

When the two questions—that is, whether the plaintiff is barred, or whether his equity is conveyed by operation of law, so that the legal title passes to the defendant by enure-ment—are reduced to principle, they become blended into the one, question—whether a State can compel a purchaser, under the Government, for a valuable consideration, to bring suit before he gets the superior or legal title, or lose his land.

The compact contained in the State Constitution is not truly stated in the case of Gray v. Givens. The opinion says merely that the General Assembly cannot "interfere with the primary disposal of the soil." It omits the very important additional provision in the compact, which is in these words, "nor with any regulation Congress may find necessary for securing the title in such soil to the *bona fide* purchaser."

I here ask upon what principle it is that the plaintiff should be deprived of his fee for not bringing suit at a time when the courts had no power over it? In Perry v. O'Han-lon, 11 Mo. 594, the court says "the laws of the United States, under which those officers profess to act, are the laws by which the validity of those acts are judged." The opinion of the court in Cabanné v. Lindell, 12 Mo. 186, has been totally misrepresented. The court there decided that the statute of limitations did not run until the survey was returned to the Recorder; but it did not decide, nor was the question before it, when the statute did commence to run.

Hunter v. Hemphill and Fenn v. Holme prove that but for the statute of this State no right of action existed until the patent issued, and of course no limitation could run until that time.

The principle the plaintiff contends for is this : It matters not how the fee or legal title passes, whether by act of Congress, or confirmation, or patent. Until it does pass, the rights of the person to whom it is passed cannot be barred or con-veyed away or affected by State legislation, and that all ques-tions as to who is entitled to the benefit of such fee must be determined solely by reference to the laws of Congress.

These doctrines are established in their fullest extent, and almost in *totidem verbis*, by the Supreme Court of the United States in Irwin v. Marshall, 20 How. 563.

The principles established by this decisions in this State, and in the Supreme Court of the United States, are sustained by the decisions in other States.

Until the title issues the possession is under, not adverse to, the Government, and the statute does not run until the patent issued—Morris v. Thomas, 5 Birney, 79; Proprietors No. Six v. McFarland, 12 Mass. 236; Runey v. Edwards, 15 Mass. 251–295; Chiles v. Calk, 4 Bibb, 554.

II. As to the conveyance of the equitable interest by statute, relation and enurement:

1. The two questions, whether the plaintiff's remedy is merely barred, or whether his equity is conveyed and vested in the defendant by operation of the statute of limitations, are so intimately blended together that I have considered them above as one and the same.

The reasons which prevent the bar operate with equal force against the conveyance; but there are additional and irresistible reasons why the conveyance can not be operated by the statute, and especially in a case where there is no bar.

2. If the State were to deny a remedy to the plaintiff in its courts (which it has not done), while this would be a denial of justice, and a violation of its constitution, there might be no redress; but for it to attempt to convey away the land from a purchaser under the Government by a statute, and not upon any equitable grounds of relief, is, in effect, a grant of the land by the State Government to the defendant without any consideration paid by him, which is a violation of the constitutional compact.

In this point the defendant sets up a conveyance by the State in opposition to a conveyance by the United States.

In Cabanné v. Lindell, it is said; "The remedy offered by the State the claimant might use or not, at his pleasure." Then surely the State cannot impose on him the penalty of conveying his land to another for exercising his " pleasure."

3. In Biddle v. Mellon, the court hold that the statute, when it runs or operates, conveys the title; but the first question is, whether it runs against the plaintiff's title while it was in the Government? To say that it cannot operate as a bar, but does operate as a conveyance, is to reverse the universal order of law, and to affirm that the plaintiff still has his remedy, but has lost his right—that the statute conveys the land for not suing in a case to which the statute does not apply. If the statute does not run against the title, it does not operate at all. In Biddle v. Mellon it was admitted that the remedy was gone, and the only question was, whether in such a case the right was conveyed.

No question was raised in that case concerning titles emanating from the Government, and none such were determined by it. This is the entire decision: "We are of opinion that twenty continuous years' adverse possession of land confers upon the possessor an absolute title against all persons unexcepted by the terms of the statute."

Now, the possession here was "not adverse, but under the Government"—Landes v. Perkins, 12 Mo. And again the Government is excepted by the statute as much as if it were by name included in the exceptions—Ang. on Lim. 34–6; Com. v. McGowan, 4 Bibb, 64; Chiles v. Calk, 554; Com. v. Johnson, 6 Barr, 136.

III. The court has fallen into a mistake as to fundamental facts concerning the return of the survey in 1841, and as to my point in relation to the same; which is not surprising, as the defendants' counsel have many times stated the facts erroneously. The point which I made, and now repeat, and upon which no opinion has yet been given by the court, and which, if valid, is decisive of all questions on the statute of limitations, and which I therefore pray the court to decide, is this:

The copy or "transcript plat" of this survey, which was returned to the Recorder of land titles in 1841, did not show any of the interferences. A patent certificate was issued on it, and sent to the Land Department at Washington for a

patent.   The department there declined to issue the patent, and remitted the survey—or rather the copy of it—back to the Surveyor General's office by an official letter, dated 19th March, 1847, directed to F. R. Conway, Esq., Surveyor General.   This was many years before I became connected with these affairs.   The order of 1862 was given in evidence solely to prove that the rules of the department required the interferences to be shown on the plats sent first to the Recorder, and by him transmitted to Washington.   That the Commissioner of the General Land Office had power to revise the surveys, is established by the Supreme Court of the United States in Maguire v. Tyler, 1 Black; Lessieur v. Price, and the act of 17th February, 1815.   That such a requirement is legal and proper, will hardly be disputed. That there was any official misconduct, or wrong intention on the part of the Commissioner, cannot be pretended.

Now when this "transcript plat" of the survey was, in 1847, remitted back to the Surveyor General's office, where it originally started from, and was not recognized, but repudiated, by the department at Washington, was it still existing as a valid and legal return of the survey to the Recorder? Will this court hold that the department at Washington had no power to remit such a survey, in good faith, to the Surveyor General in order that it should be made to conform to the reasonable and proper requirements of the department, and that the return is valid notwithstanding its repudiation and remission?

If the return copy of the survey was thus made void, of course, the patent certificate No. 447, issued on it, became null.

HOLMES, Judge, delivered the opinion of the court.

A rehearing was granted in this case upon the question of the statute of limitations, and also upon the effect of the first decree in chancery to pass the title of the minor heir of Christian Wilt, upon a suggestion that other authorities could be produced on that subject.

As to the matter of the decree, we have seen no reason to change onr former opinion, nor would it affect the result even if there were any error in this. It was only one of three distinct reasons given why the equitable right to the located land did not pass from the heir of Wilt and from Hertzog before the decree made in 1848, either one of which was deemed sufficient. This result appeared to be so manifest as not to require discussion at length. On this part of the case we do not entertain the least doubt.

The question whether the plaintiff's action was barred by the statute of limitations has been reargued, on the part of the defendants, upon the same grounds that it was before. It seemed to be supposed then, as it is now, that the location alone, when made in 1841, operated as an exchange to pass the title out of the United States, and that, therefore, the statute, beginning to run from that date, would be a complete bar to the plaintiff's action. No legal theory, no principle of law, was ever suggested, nor has been now, on which it was conceived that such a result could possibly take place.

It was said in the former opinion, that " until the patent issued the legal title remained in the United States, and the statute of limitations did not begin to run against the plaintiff before the date of the patent." This conclusion proceeded upon the ground that although the action given by the statute upon the equitable right only, which had passed out of the United States, might be barred, it did not follow that an action based upon the right of entry by virtue of the absolute legal title by patent would also be barred. The idea that the fiction of relation could be applied, not only to carry the legal title to the owner of the inceptive right, through the intermediate conveyances, but also for the purpose of bringing it within the operation of the statute of limitations from the date of the inceptive equity, had not been suggested, and had not occurred to us. The argument did not proceed upon this theory, but (as we understand it) upon the supposition that the whole title passed out of the United States by virtue of the location and exchange, and

was therefore barred by the statute. This position is so directly antagonistic to repeated decisions of the Supreme Court of the United States, that it is considered to be wholly untenable—Fenn v. Holme, 21 How. (U. S.) 481; Hooper v. Scheimer, 23 How. (U. S.) 235; Irwin v. Marshall, 20 How. (U. S.) 558; Bagnell v. Broderick, 13 Pet. 448.

The case of Gray v. Givens, 26 Mo. 291, had been cited as an authority to the point, that the statute began to run from the date of the location, and there being no doubt on that point, so far as the equitable title was concerned, we had not noticed that the plaintiff, in that case, had introduced a patent dated in 1855, as well as evidence of the location made long before, and that the court had decided that the whole cause of action was barred by the statute, notwithstanding the patent. The reasons and authorities which are given in the opinion, in support of this decision, are not at all satisfactory to our minds; but, upon other grounds which we proceed to state, we have arrived at the conclusion that the decision was right.

It is well settled that no statute of limitations of a State can run against the United States, nor affect the grantees of the Government, until the title has passed from the proprietary sovereignty. Statutes of limitation operated to bar the cause of action, not to convey title from one party to another, and they merely extinguish the remedy by operating a bar to every kind of action; though adverse possession for the full period of the limitation may be evidence of a fee, and equivalent to an absolute title, against all but the sovereign—3 Greenl. Crui. Dig. tit. 31, ch. 2, § 1–4; Ang. Lim. 396; Biddle v. Mellon, 13 Mo. 335; 1 Greenl. Ev. § 16.

No cause of action upon a right of entry by virtue of the legal title by patent, as such only, could exist until the patent issued. The statute gave an action in ejectment based upon the right of entry by virtue of the equitable right created by the location. Whether that right were such an interest, or title of property, as could give the party, otherwise, a standing in a court of law, it is needless to in-

quire here. It is easy to understand how an action, founded upon any such right or title, which had passed out of the United States, might be barred by the statute; but it would by no means follow that an action based upon another right of entry, by virtue of the absolute title by patent, would also be barred. It is an old maxim, that where two rights concur in one person, it is all the same as if there were different persons; where there is a new right there is a new period in which to pursue the remedy; and if two separate rights exist, the loss of one by lapse of time will not impair the other—3 Greenl. Crui. Dig. 247; Stowell v. Lord Zouch, Plowd. 368; Ang. Lim. 390. The action of ejectment upon a location is given by the statute only, and would not exist otherwise; but an action of ejectment upon the legal title by patent exists by laws of the United States, and of this State, without the help of this special provision of the statute. The two rights of entry, therefore, are distict in themselves, and the causes of action have a different foundation. The possession of the same land is claimed in both, but by different rights, and, if there were nothing more, the one cause of action might be barred, and not the other.

But there is another principle upon which we think the statute may be made to operate here as a bar to the plaintiff's action, and that is the fiction of relation, whereby the legal title is to be considered as passing out of the United States, through the patent, at its date, but as instantly dropping back in time to the date of the location as the first act, or inception of the conveyance, to vest the title in the owner of the equity as of that date, and make it pass from him to the patentee named, through all the intermediate conveyances; and so, that the two rights of entry, and the two causes of action, are thus by relation merged into one, and the statute may be held to have operated upon both at once. The legal title in making this circuit necessarily runs around the period of the statute bar, and the action founded upon this new right is met by the statute on its way, and cut off with that which existed before. Each one of the parties,

through whom the patentee derived the equitable right, had in succession an effective action for the recovery of the possession of this land, during all that time, while an adverse possession existed. This áction was, by the statute, placed upon the same footing, and was equally effectual as if the party had all the while been invested with the legal title— Hunter v. Hemphill, 6 Mo. 119.

This possession was not adverse to the United States, but would be considered as held under the Government (Landes v. Perkins, 12 Mo. 258); but it was adverse to the other parties, who were claiming to be the owners of this same equitable right under which the plaintiff claims, and to which the legal title was united by relation, and it was therefore adverse to both titles. The defendants, though without title, were in possession under a claim of title, and with an expectation of obtaining the title from the United States. The possession of one with the intention to acquire a right of pre-emption has been held to work a disseisin of all but the sovereign—Clemens v. Runckel, 34 Mo. 41.

In Landes v. Brant, 10 How. (U. S.) 372, and French v. Spencer, 21 How. (U. S.) 228, the doctrine of relation was applied to the title, as between the parties and purchasers, which was made to relate back and bear date with the inceptive right, so that the intermediate conveyances should be "covered by the legal title." In Landes v. Brant, it was applied (independently of the act of Congress of May 20, 1856, in reference to deceased parties) where the relation carried back the title to a time when the confirmee was still living. The operation of the statute of limitations upon a title so vesting was not specially considered. An instruction had been given for the defendant, in the U. S. Circuit Court below, which might have involved this application of the fiction of relation ; but it was not particularly examined, and the judgment was affirmed, from which it might be inferred that the instruction was not condemned. The one application would seem to follow, logically, from the other. No reason is perceived why the legal title should not be con-

sidered as vested of that date, with reference to the statute
of limitations, as well as for the purpose of passing the title
to a purchaser, through intermediate conveyances.   The
very essence of the fiction regards time, and effect is given
to the patent as if it bore date with the first act or inception
of the conveyance.   Nor does it seem to make any difference
that the patent is made directly to a living person by name.
This patent was issued to Mary McRee as assignee by de-
raignment of title, and as being the owner of the equitable
right.   The legal title and the inceptive right could be united
in her only by virtue of the relation.   In the cases of sheriffs'
deeds made to the purchaser by name, after the day of sale,
the deeds are held to relate to the day of sale, and to vest
the title as of that date—Boyd v. Longworth, 11 Ohio, 235 ;
Alexander v. Merry, 9 Mo. 524 ; Crowley v. Wallace, 12
Mo. 145 ; Jackson v. McCall, 3 Conn. 75.   In the cases of
Crowley v. Wallace, and Jackson v. McCall, the suit was
commenced after the sale, but before the deed was made,
and it was held that the title should be considered as vested
by relation as of the date of the sale, to avoid the objection
that the plaintiff could only recover on the title which he
had at the commencement of his suit.   Time was the only
thing in question, and if a title by relation may antedate a
suit commenced, it may as well antedate the period of the
statute bar.

Resort must be had to this principle in order to make the
patent avail to the patentee.   It is only by virtue of her
equitable right as assignee of the owner of the injured land,
who made the exchange and became entitled to the land
located in lieu thereof as a purchaser from the Government,
that she was the person entitled to receive the patent at all.
If the patent had been issued to an entire stranger to this
right, we suppose it would have been void for want of author-
ity of law to make it.   She must invoke this fiction, then, in
order to make the patent avail to vest a valid legal title in
her.   It reaches her only by passing through the chain of
derivative title from the first locator by relation, and in pass-

ing it is met and cut off by the statute bar.   It is impossible, therefore, to apply in her favor the exception that the fiction may hold to some intent, and to some intent not, *ut res magis valeat quam pereat*.   The patent is not thereby rendered inoperative or void, but made valid to pass the title to the true grantee, the original purchaser from the United States, and from him to her.   If any injury or injustice be done to her, it is not by the relation.   Whatever injury she may be said to sustain, she suffers only by reason of the operation of the statute of limitations, and this in contemplation of law is no injustice.   The plaintiff stands in her place here, and must fail to recover, not because the patent. is declared invalid, or ineffectual to pass the title from the United States, nor because the title has not been conveyed to him, but because the statute has extinguished his remedy by taking away every kind of action.

It is laid down that the fiction is not to be applied to the injury of the rights of a stranger.   Here no such rights intervene.   It is to be applied in furtherance of justice, *ut res magis valeat quam pereat;* and on this principle it may have effect to some intent, and not to some other intent, as to make a deed, a lease, or an escrow, operative, but not to make it void—Butler and Baker's case, 3 Coke, 36; Menvil's case, 13 Coke, 21; 18 Vin. Abr. 290; 4 Kent's Com. 454.   It may have effect to overreach a right or title of later origin than the first act to which relation is had—Thompson v. Leach, 3 Lev. 284; Rutherford v. Greene, 2 Wheat. 297.   It will not be applied against the real fact, where it would operate to deprive a party of his defence under the statute of limitations—Lyttleton v. Cross, 3 Barn. & Cres. 317.   That would do injustice to a third person and a stranger.   These defendants are strangers to the parties to this conveyance, but, of course, no injustice is done to them; and we see no reason why they are not entitled to the benefit of this defence.   Nor do we find any ground on which an exception can be made in favor of the plaintiff.   It is objected that no relation can be had to a trespass; but the

effect is not to make the title pass to a trespasser, or mere intruder, but to make it vest in the plaintiff through the inceptive title, whereby, as a necessary consequence, his action is barred, and his remedy lost.

This is a mere fiction of law, and it goes upon reasoning that is somewhat abstruse and technical. The maxim *nullum tempus occurrit regi* is also technical in its operation. It was said in Crawley v. Wallace, that this fiction could not be applied to a better purpose than to prevent another fiction from working an injury. We know no other justice here than the justice of the law; nor do we see than any such injustice would be done to the plaintiff as should prevent us from giving the defendants the benefit of the fiction. And further, it comes in support of the former deliberate decision of this court in Gray v. Givens, 26 Mo. 291, which seems to have been rendered in accordance with the ideas which have prevailed in this State, and which is entitled to the weight of a precedent with us.

Upon these principles, the statute is made to operate a bar to the plaintiff's action, without coming in conflict, in any manner, with the decisions of the Supreme Court of the United States as to the effect and dignity of a patent, or with the constitutional compact that the State " shall never interfere with the primary disposal of the soil of the United States, nor with any regulation Congress may find necessary for securing the title in such soil to the *bona fide* purchasers." It contemplates that the title has passed out of the United States by virtue of the patent, and in accordance with the laws of the United States, and become vested in such purchaser.

In the former opinion in this case, the question whether the public officers had power to annul the location merely because the transcript plat did not show the interferences with other surveys, was considered in reference to the validity of the patent that had been issued. It is now insisted by the plaintiff, in reference to the defence under the statute of limitations, that the transcript plat and patent certificate were

in 1847 repudiated by the Land Department, and remitted to the Surveyor General for re-examination as to these interferences; that when the new transcript plat had been returned, and reported to the Commissioner, with a new patent certificate, the former documents were annulled under instructions from him in 1862, and that the patent was issued upon the new certificate; and that therefore the location made in 1841 was void *ab initio*, or had been repudiated and annulled, so that the statute of limitations could not run against him until 1862.

It appears by the record that in 1847 instructions were sent to the Surveyor General to examine into "the various conflicts with said survey," and to report his "decision" as to "the validity of each interference"; and it was said therein, in substance, that if any of the lands embraced within the interferences had been *reserved* at the date of the location, the location must yield to them, because interdicted so far by the New Madrid act; but that if such lands were not reserved, but were subject to location under the act, then "the New Madrid claim would of course hold valid against either tract in that category." The validity of such conflicting titles would be a matter of law and a proper subject of judicial inquiry whenever they might be produced in court. It may have been very proper that the plat should show these interferences; but it is evident that the location, as made in 1841, was not regarded by the Commissioner as wholly void, nor was the transcript plat entirely repudiated. The object seems to have been to have the plat corrected so as to show the interferences of conflicting surveys which might be valid against the location, because the lands contained in them had been reserved, or were not subject to location, and more particularly with a view to the issuing of a patent in proper form; and when the corrected plat and new patent certificate had been reported to the Commissioner in 1862, then the old plat and certificate were declared "inoperative," the Recorder and Surveyor General were instructed to cancel them, and the patent issued upon

the new documents. The location itself was not annulled. The return of the plat to the Recorder and the recording of it by him are the acts which evidence the assent of the Government to the location and make an appropriation of the land; the United States then assented to the exchange—Lessieur v. Price, 12 How. (U. S.) 74; Bagnell v. Broderick, 13 Pet. 436.

We find no evidence here that these officers had ever undertaken wholly to annul this location, or to declare it void *ab initio*. When the old papers had been "superseded" by the new, the old ones were declared "inoperative." The new documents do not appear to have differed from the old ones otherwise than as they showed the interferences. So far as any of these lands had been reserved, or were not subject to location, we suppose the location would be void, and the patent also; but we know no authority for saying that the location as made would therefore be wholly invalid. It might be valid as to a part of the land included and void as to the rest. So far as valid, it was a good location; and so it seems to have been considered by the Commissioner. When entries have been made or rights or titles have emanated from the Government in pursuance of law, the public officers have no power to annul them. In Fenn v. Holme, 21 How. (U. S.) 481, these instructions were before the court, and the plaintiff failed to recover for the reason that the action of the Land Department had not terminated in a patent conveying the title; but it was not intimated that the location of 1841 had been annulled, or would be held to be entirely void—Groom v. Hill, 9 Mo. 320; Perry v. O'Hanlon, 11 Mo. 585; U. States v. Stone, 2 Wall. (U. S.) 525.

We must therefore conclude that this location as made in 1841, for so much of this land as had never been sold nor reserved, but was then subject to location, was valid; that it has never been annulled by the public officers, nor by any action of the Land Department; and that the statute of limitations began to run, as against the plaintiff, claiming by a right and title which had emanated from the Government,

Gibson v. Chouteau's heirs.

and upon which an action was given, upon an adverse possession held within the terms of the statute, from the date of the location made in 1841.

It follows that the instruction given for the plaintiff was erroneous, and that the instructions asked for by the defendants on the subject of the statute of limitations should have been given.

There being no dispute as to the fact of the possession, and the plaintiff not desiring to have the cause remanded, the judgment will simply be reversed. The other judges concur.